Ben F. Pierce Gore (SBN 128515)
PRATT & ASSOCIATES
1871 The Alameda, Suite 425
San Jose, CA 95126
Telephone: (408) 429-6506
Fax: (408) 369-0752
pgore@prattattorneys.com

*Attorneys for Plaintiffs*

**Filed**

DEC 2 0 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

Fee paid
SI   (99)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CV 12 - 6449 PSG

| | |
|---|---|
| ELIZABETH PARK and CAROLYN OTTO, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION AND REPRESENTATIVE ACTION** |
| v. | **COMPLAINT FOR DAMAGES, EQUITABLE AND INJUNCTIVE RELIEF** |
| WELCH FOODS INC., A COOPERATIVE, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs Elizabeth Park and Carolyn Otto ("Plaintiffs"), through their undersigned

attorneys, bring this lawsuit against Welch Foods Inc. (hereinafter "Welch's" or "Defendant") as to

their own acts upon personal knowledge, and as to all other matters upon information and belief. In

order to remedy the harm arising from Defendant's illegal conduct, which has resulted in unjust

profits, Plaintiffs bring this action on behalf of a nationwide class of consumers, and in the

alternative, a sub-class of California consumers, more specifically defined herein, who purchased

any of Defendant's products unlawfully labeled "No Sugar Added" or bearing improper nutrient

content or health claims, or false representations that the products are "all natural" and thus free

-1-
*Class Action Complaint*

from artificial colors, flavors or preservatives (hereafter, "Misbranded Food Products") in the last four years (the "Class Period").

1.      Every day, millions of Americans purchase and consume packaged foods. Identical federal and California laws require truthful, accurate information on the labels of packaged foods. This case is about a company that flouts those laws and sells misbranded food to unsuspecting consumers. The law, however, is clear: misbranded food cannot legally be manufactured, held, advertised, distributed, or sold. Misbranded food is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their purchase price.

2.      If a manufacturer is going to make a claim on a food label, the label must meet certain legal requirements that help consumers make informed choices and ensure that they are not misled. Defendant has made, and continues to make, false and deceptive claims in violation of federal and California laws that govern the types of representations that can be made on food labels. These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits.

3.      Under California law, which is identical to federal law, a number of Defendant's food labeling practices are unlawful because they are deceptive and misleading to consumers. These include:

A.      Representing food products to be "all natural" when they contain significant quantities of undisclosed chemical preservatives, synthetic chemicals, added artificial color and other artificial ingredients;

B.      Representing food products to be free of artificial ingredients, colors and preservatives when they in fact contain artificial ingredients, colors and preservatives;

C.      Failing to disclose the presence of chemical preservatives and artificial added colors in the ingredient lists of food products as required by law;

D.      Making unlawful nutrient content claims on the labels of  food products that fail to meet the minimum nutritional requirements that are legally required for the nutrient content claims that are being made;

E.      Making unlawful antioxidant claims on the labels of food products that fail to meet the minimum nutritional requirements that are legally required for the antioxidant claims that are being made; and

F.    Making unlawful health claims on the labeling of food products.

4.    Under federal and California law, Defendant's Misbranded Food Products cannot legally be held or sold. These laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits. More importantly, these laws recognize that the failure to disclose the presence of risk-increasing nutrients is deceptive because it conveys to consumers the net impression that a food makes only positive contributions to a diet, or does not contain any nutrients at levels that raise the risk of diet-related disease or health-related condition.

5.    In particular, Defendant has engaged in a deceptive practice that is prohibited by California and federal law, *i.e.*, making unlawful "no sugar added," "all natural," and other nutrient content, health and antioxidant claims, or claims that products are free from artificial flavors, colors or preservatives that are prohibited by law.

6.    Defendant's false and misleading labeling practices are designed to increase sales and justify the premium prices of Defendant's products at issue.

7.    In order to remedy the damages arising from Defendant's illegal conduct and which have resulted in unjust profits, Plaintiffs bring this action on behalf of a California class of consumers who purchased Defendant's Misbranded Food Products.

8.    Identical federal and California laws regulate the content of labels on packaged foods. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA") were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 109875, *et seq.*   Under FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or in its labeling. 21 U.S.C. § 343(a).

9.    Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art. Misbranding reaches not only false claims, but also those claims that might be technically true, but still misleading, "[b]earing in mind the broadly remedial purposes of the Act in preventing deception, the Congress must be taken to have meant to strike not only at palpably false claims but also at clever indirection and ambiguity in the creation of

-3-

misleading impressions. *V. E. Irons, Inc. v. U.S.* 244 F.2d 34, 42 (1st Cir. 1957).  If any single representation in the labeling is misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.  "Misleading" is judged in reference to those "who, when making a purchase, do not stop to analyze."  *United States v. El-O-Pathic Pharmacy*, 192 F.2d 62, 75 (9th Cir. 1951).  Under the FDCA, it is not necessary to prove that anyone was actually misled.

10.     In promoting the health benefits of its Misbranded Food Products, Defendant has adopted irresponsible marketing and advertising policies.  Defendant claims to understand the importance of communicating responsibly about its products.  Nevertheless, Defendant has made, and continues to make, false and deceptive claims on its Misbranded Food Products in violation of federal and California laws that govern the types of representations that can be made on food labels. In particular, in making its unlawful "no sugar added" claim, Defendant has violated nutrient content labeling regulations mandated by federal and California law which require a disclosure of items present in a food at a level that the FDA has concluded increases the risk of diet-related disease or health-related condition.  Such a disclosure is required whenever a nutrient content claim is made.  In making its unlawful "all natural" and free from artificial flavors, colors or preservatives claim, Defendant has violated food labeling regulations mandated by federal and California law which require claims to be truthful and not misleading. Further, Defendant has violated nutrient content labeling regulations mandated by federal and California law which require a product claiming to be healthy or to contain antioxidants or other nutrients to meet certain minimum nutritional thresholds. Defendant has also made a number of unlawful health claims.

11.     Defendant's practices arose from a recognition that consumers were purchasing less of the Defendant's products because of concerns about sugar, carbohydrates, and calories and were instead choosing alternatives that they viewed as healthier. Defendant's also recognized that consumers were turning to products that were natural and were not artificial or processed but rather were in the Defendant's words "real." Defendant engaged in a number of initiatives to gauge what drove consumer purchasing decisions in order to "fuel our growth" … "via better consumer understanding and insights." Defendant used this knowledge to market its products through "highly

-4-

*Class Action Complaint*

1    effective television advertising, an expanded online presence, new outreach programs – and even

2    our packaging."  Defendant's goal was to "fulfill the marketplace's strong need" for among other

3    things "health and nutrition, simplicity and clarity of origin."

4        12.    In discussing its efforts Defendant stated:

5    Our Products:

6    Health and Nutrition Resonate with Consumers
7    This year's expanded health and nutrition message played well with consumers,
     who are increasingly aware of what's in their food, where it comes from, and how
8    it helps them stay healthy.

9    In 1869, no one had heard of polyphenol antioxidants. They just knew that grape juice
     tasted great. Now consumers are more health-conscious than ever. They want to be
10   sure that they make healthy choices and maximize nutrition. They want to know where
     their food comes from and who grows it. They want to fuel their bodies with healthy
11   food and juices. Which is very good news for Welch's.

12
     Inherently healthy products from real grapes
13
14   Welch's is in a unique position to deliver products that combine health and nutrition
     and great taste. The strong health credentials of grape juice have been a recurrent
15   theme in Welch's history, marketing strategy, and advertising. But we amplified and
     strengthened our health message in recent years, focusing on the polyphenol antioxidant-
16   packed Concord grape and the health benefits of our 100% grape juice. This message
     resonated with consumers in the U.S., as well as in international markets –such
17   as Puerto Rico, the UK, Canada, Japan, and China – where health and nutrition have
     been a key part of the Welch's message for several years.
18
19   Deepening our commitment to health and nutrition

20   Our health and nutrition communications of FY '08 highlighted the antioxidant power of
     Welch's 100% grape juice, as well as its role in maintaining a healthy immune system. In
21   FY '09, we continued to expand and elevate the company's health message by focusing
     on how Welch's 100% grape juice helps support a healthy heart and immune system.
22   We also educated consumers on polyphenol antioxidants, including their ability to
     protect healthy cells against the damaging effects of unstable molecules– free radicals.
23
24   Taking the message to the masses

25   In our FY '09 ads, Food Network personality and Welch's spokesperson Alton Brown
     … provided straight-talking insights and chalkboard lessons that educated
26   consumers about polyphenols and helped demystify the science behind Concord grapes.
     A FY '09 study led by Dr. Richard Mattes, a professor in the Department of Foods and
27   Nutrition at Purdue University, showed that Concord grape juice isn't associated with
28   significant weight gain or changes in appetite, and may actually reduce waist circumference.

And Welch's continued to invest in studies to define the health benefits of Concord grape juice – the core of our patron-based products– even further.

13.    Similarly, Welch's indicated that it was creating lines like its "Naturals," Defendant's all natural fruit spreads line to meet "an unmet market need for a more natural spread" with no artificial flavors or preservatives.

14.    Intending to profit from consumers' increasing desire to purchase healthier and more natural foods, Defendant misbranded its juices and spreads (including jellies and jams) by, among other things, making nutrient content claims that are strictly prohibited by the Food and Drug Administration ("FDA"), and by misleading purchasers into believing that its products are healthier because there is "no sugar added" or are "100% juice" or "all natural" in order to induce consumers into purchasing Welch's products.

15.    Defendant has made a number of specific unlawful, improper, unauthorized, misleading, and false claims on its products' labeling, and on its website: www.welchs.com. Defendant's web address appeared on its package labels during the Class Period. By law, Defendant's website representations are incorporated in its package labels.

16.    Defendant makes claims on the labeling of some of its juices and drinks that they have "no sugar added."  For instance, the labels of Defendant's "100% Juice" products, including Grape and White Grape, White Grape Cherry and Black Cherry Concord Grape flavors, prominently state "No Sugar Added" on the front of the label:

///

///

///

///

17.    Defendant's state that its "Natural" spreads are "All Natural" with "No Artificial Flavors" or "No Preservatives" despite having sodium citrate and citric acid which are preservatives.

18.    Defendant claims that its 100% juice products such as its 100% Grape Juice, 100% White Grape Cherry Juice, and 100% Black Cherry Concord Grape Juice products have no artificial flavors or preservatives despite containing ascorbic acid, potassium sulfites, or citric acid.

19.     This action targets the continued sale of Defendant's Misbranded Food Products. Defendant is manufacturing, distributing, packaging, labeling, marketing, advertising, and/or selling food products in violation of state and federal laws and regulations designed to: (1) prevent the manufacture and sale of misbranded food products; (2) ensure the truthful and accurate labeling of food products; and (3) prevent unfair and deceptive sales, advertising, and business practices.

20.     Consumers rely on food labeling claims with the understanding that nutritional information on product packaging is highly regulated and, therefore, should be trustworthy.

21.     Consumers often do not look beyond the nutrient content claims and health claims made on the front of the food product packaging, and are less likely to check the Nutrition Facts panels contained on the back of packaging where front-of-packaging nutrient content claims are present.  Understanding this, companies increasingly make misleading front-of-package nutrition claims intended to indicate that a product is a healthy choice, when that product may in fact have a poor overall nutritional profile.

22.     Defendant has made, and continues to make, unlawful, false, and deceptive claims on its Misbranded Food Products in violation of federal and California laws that govern the types of representations that can be made on food labels.  In particular, Defendant has violated nutrient content labeling regulations and misbranding laws mandated by federal and California law, along with a number of other food labeling and misbranding laws mandated by federal and California law, including those prohibiting false or misleading label claims.  These violations render these products "misbranded."  Under federal and California law, Defendant's Misbranded Food Products cannot legally be manufactured, advertised, distributed, held, or sold.

23.     Defendant's false and misleading labeling practices stem from its overall marketing strategy.  Thus, the violations and misrepresentations are similar across product labels and product lines.

24.     As described herein, Defendant continues to misbrand its products despite the fact that the FDA has issued warning letters regarding the same or similar issues.

25.     Plaintiffs seek injunctive relief and to recover damages on their own behalf and on behalf of nationwide class of consumers, and in the alternative, a sub-class of California consumers

-8-

based on Defendant's violations of California's Unfair Competition Law [Cal. Bus. & Prof. Code §§ 17200, *et seq.*]; California's False Advertising Law [Cal. Bus. & Prof. Code §§ 17500, *et seq.*]; California's Consumers Legal Remedies Act [Cal. Civ. Code §§ 1750, *et seq.*];, breach of warranty, and unjust enrichment.

## PARTIES

26.   Plaintiff Elizabeth Park is a resident of Los Gatos, California, who purchased Defendant's misbranded food products in California during the four (4) years prior to the filing of this Complaint (the "Class Period") in an excess of $25.00.

27.   Plaintiff Carolyn Otto is a resident of San Jose, California, who purchased Defendant's misbranded food products in California during the Class Period, in an excess of $25.00.

28.   Defendant Welch Foods Inc. is a foreign corporation with its headquarters in Concord, Massachusetts. Welch's is the food processing and marketing arm of the National Grape Cooperative Association.

29.   Defendant is a leading producer of foods and beverages, including the products described herein.

30.   Defendant sells its Misbranded Food Products to consumers through grocery stores and other retail stores throughout the United States and California.

31.   California law applies to all claims set forth in this Complaint because Plaintiffs live in California and purchased Defendant's products here.   Also, Defendant sells products in California.  The misconduct alleged herein was implemented in California and has a shared nexus with California.  The formulation and execution of the unlawful practices alleged herein occurred in, or emanated from, California.   Accordingly, California has significant contacts and/or a significant aggregation of contacts with the claims asserted by Plaintiffs and all Class members.

## JURISDICTION AND VENUE

32.   This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class;

(2) members of the proposed class have a different citizenship from Defendant; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

33.     The Court has jurisdiction over the federal claim alleged herein pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

34.     The Court has jurisdiction over the California claims alleged herein pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy under Article III of the United States Constitution.

35.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

36.     The Court has personal jurisdiction over Defendant because a substantial portion of the wrongdoing alleged in this Complaint occurred in California, Defendant is authorized to do business in California, has sufficient minimum contacts with California, and otherwise intentionally avails itself of the markets in California through the promotion, marketing and sale of merchandise, sufficient to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

37.     Because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Court has personal jurisdiction over Defendant, venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

## FACTUAL ALLEGATIONS

**A.      Identical California and Federal Laws Regulate Food Labeling**

38.     Food manufacturers are required to comply with identical federal and state laws and regulations that govern the labeling of food products.  First and foremost among these is the FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

39.     Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or

after that date shall be the food regulations of this state."   California Health & Safety Code § 110100.

40.   In addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations.  For example, food products are misbranded under California Health & Safety Code § 110660 if their labeling is false and misleading in one or more particulars; they are misbranded under California Health & Safety Code § 110665 if their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and regulations adopted thereto; they are misbranded under California Health & Safety Code    § 110670 if their labeling fails to conform to the requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and regulations adopted thereto; they are misbranded under California Health & Safety Code § 110705 if words, statements, and other information required by the Sherman Law to appear on their labeling are either missing or not sufficiently conspicuous; they are misbranded under California Health & Safety Code § 110735 if they are represented as having special dietary uses but fail to bear labeling that adequately informs consumers of their value for that use; and they are misbranded under California Health & Safety Code § 110740 if they contain artificial flavoring, artificial coloring, and chemical preservatives but fail to adequately disclose that fact on their labeling.

**B.     FDA Enforcement History**

41.   In recent years, the FDA has become increasingly concerned that food manufacturers were disregarding food-labeling regulations.  To address this concern, the FDA elected to take steps to inform the food industry of its concerns and to place the industry on notice that food labeling compliance was an area of enforcement priority.

42.   In October 2009, the FDA issued a "Guidance For Industry: Letter Regarding Point Of Purchase Food Labeling ("2009 FOP Guidance") to address its concerns about front-of-package labels.  The 2009 FOP Guidance advised the food industry:

> FDA's research has found that with FOP labeling, people are less likely to check the Nutrition Facts label on the information panel of foods (usually, the back or side of the package).  It is thus essential

that both the criteria and symbols used in front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading. The agency is currently analyzing FOP labels that appear to be misleading. The agency is also looking for symbols that either expressly or by implication are nutrient content claims. We are assessing the criteria established by food manufacturers for such symbols and comparing them to our regulatory criteria.

It is important to note that nutrition-related FOP and shelf labeling, while currently voluntary, is subject to the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations. Therefore, FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in <u>Title 21 Code of Federal Regulations (CFR) 101.13</u> and <u>Subpart D of Part 101</u> is misbranded. We will consider enforcement actions against clear violations of these established labeling requirements. . .

… Accurate food labeling information can assist consumers in making healthy nutritional choices. FDA intends to monitor and evaluate the various FOP labeling systems and its effect on consumers' food choices and perceptions. FDA recommends that manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA laws and regulations. FDA will proceed with enforcement action against products that bear FOP labeling that are explicit or implied nutrient content claims and that are not consistent with current nutrient content claim requirements. FDA will also proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading.

43.    The 2009 FOP Guidance recommended that "manufacturers and distributors of food products that include FOP labeling ensure that the label statements are consistent with FDA law and regulations" and specifically advised the food industry that it would "proceed with enforcement action where such FOP labeling or labeling systems are used in a manner that is false or misleading."

44.    Defendant had actual knowledge of the 2009 FOP Guidance.

45.   Despite the issuance of the 2009 FOP Guidance, Defendant did not remove the unlawful and misleading food labeling claims from its Misbranded Food Products.

46.   On March 3, 2010, the FDA issued an "Open Letter to Industry from [FDA Commissioner] Dr. Hamburg" ("Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers.  In pertinent part, the letter stated:

> In the early 1990s, the Food and Drug Administration (FDA) and the food industry worked together to create a uniform national system of nutrition labeling, which includes the now-iconic Nutrition Facts panel on most food packages.  Our citizens appreciate that effort, and many use this nutrition information to make food choices.  Today, ready access to reliable information about the calorie and nutrient content of food is even more important, given the prevalence of obesity and diet-related diseases in the United States.  This need is highlighted by the announcement recently by the First Lady of a coordinated national campaign to reduce the incidence of obesity among our citizens, particularly our children.
>
> With that in mind, I have made improving the scientific accuracy and usefulness of food labeling one of my priorities as Commissioner of Food and Drugs.  The latest focus in this area, of course, is on information provided on the principal display panel of food packages and commonly referred to as "front-of-pack" labeling. The use of front-of-pack nutrition symbols and other claims has grown tremendously in recent years, and it is clear to me as a working mother that such information can be helpful to busy shoppers who are often pressed for time in making their food selections. …
>
> As we move forward in those areas, I must note, however, that there is one area in which more progress is needed.  As you will recall, we recently expressed concern, in a "Dear Industry" letter, about the number and variety of label claims that may not help consumers distinguish healthy food choices from less healthy ones and, indeed, may be false or misleading.
>
> At that time, we urged food manufacturers to examine their product labels in the context of the provisions of the Federal Food, Drug, and Cosmetic Act that prohibit false or misleading claims and restrict nutrient content claims to those defined in FDA regulations.  As a result, some manufacturers have revised their labels to bring them into line with the goals of the Nutrition Labeling and Education Act of 1990.  Unfortunately, however, we continue to see products marketed with labeling that violates established labeling standards.
>
> To address these concerns, FDA is notifying a number of manufacturers that their labels are in violation of the law and subject to legal proceedings to remove misbranded products from the marketplace.  While the warning letters that convey our regulatory intentions do not attempt to cover all products with violative labels, they do cover a range of concerns about how false or misleading

-13-

labels can undermine the intention of Congress to provide consumers with labeling information that enables consumers to make informed and healthy food choices. For example:

\*\*\*

- Products that claim to treat or mitigate disease are considered to be drugs and must meet the regulatory requirements for drugs, including the requirement to prove that the product is safe and effective for its intended use. Misleading "healthy" claims continue to appear on foods that do not meet the long- and well-established definition for use of that term.

- Juice products that mislead consumers into believing they consist entirely of a single juice are still on the market. Despite numerous admonitions from FDA over the years, we continue to see juice blends being inaccurately labeled as single-juice products.

These examples and others that are cited in our warning letters are not indicative of the labeling practices of the food industry as a whole. In my conversations with industry leaders, I sense a strong desire within the industry for a level playing field and a commitment to producing safe, healthy products. That reinforces my belief that FDA should provide as clear and consistent guidance as possible about food labeling claims and nutrition information in general, and specifically about how the growing use of front-of-pack calorie and nutrient information can best help consumers construct healthy diets.

I will close with the hope that these warning letters will give food manufacturers further clarification about what is expected of them as they review their current labeling. I am confident that our past cooperative efforts on nutrition information and claims in food labeling will continue as we jointly develop a practical, science-based front-of-pack regime that we can all use to help consumers choose healthier foods and healthier diets.

47.   Defendant continued to utilize unlawful food labeling claims despite the express guidance of the FDA in the Open Letter.

48.   In addition to its guidance to industry in general, the FDA issued specific industry guidance about claims regarding the absence of sugar and sent warning letters to specific companies regarding specific violations, including violations pertaining to sugar-related claims on labeling. For example, in September of 2007, the FDA issued a guidance letter to the food industry that indicated the FDA was concerned about improper sugar free type claims "that fail to bear the required disclaimer statement when these foods are not "low" or "reduced in" calories or fail to

bear the required disclaimer statement in the location or with the conspicuousness required by regulation." The letter stated:

Dear Manufacturer:

The Food and Drug Administration (FDA) is concerned about the number of products we have seen that contain claims regarding the absence of sugar, such as, "sugar free" but that fail to bear the required disclaimer statement when these foods are not "low" or "reduced in" calories or fail to bear the required disclaimer statement in the location or with the conspicuousness required by regulation. As part of our continuing effort to reduce the incidence of obesity in the United States, FDA wants to ensure that consumers are provided with the label information they need to make informed choices for maintaining a healthy diet. We are highlighting accurate claims about the absence of sugar as a regulatory priority. The agency intends to take appropriate action against products that we encounter that bear a claim about the absence of sugar (e.g., sugar free) but that fail to meet each of the requirements of the regulation that defines "sugar free." We intend to pay particular attention to those foods that are required to bear a disclaimer statement under the regulation that defines "sugar free," but that fail to do so or otherwise fail to comply with the regulation, 21 CFR 101.60(c). Therefore, we are taking this opportunity to remind food manufacturers and distributors of conventional food products that the definition of "sugar free" includes several requirements.

Under the authority of the Nutrition Labeling and Education Act of 1990, FDA issued regulations for the nutrient content claim "sugar free" 58 Federal Register (FR) 2302 at 2415. "Sugar free" is defined in Title 21 of the Code of Federal Regulations 101.60(c) …

FDA has historically taken the position that consumers may associate claims regarding the absence of sugar with weight control and with foods that are low calorie or that have been altered to reduce calories significantly. Therefore, the definition **for "sugar free"** includes the requirement that any food that is not low or reduced in calorie disclose that fact. Without such information some consumers might think the food was offered for weight control. See 56 FR 60421 at 60435. Consequently, the definition for **"sugar free"** includes the requirement that the **food be labeled with the claim "low calorie" or** "reduced calorie" or bear a relative claim of special dietary usefulness labeled in compliance with 21 CFR 101.60(b)(2), (b)(3), (b)(4), or (b)(5) or such claim is immediately accompanied, each time it is used, by one of the following disclaimer statements: "not a reduced calorie food," **"not a low calorie food,"** or "not for weight control" (see 21 CFR 101.60(c)(1)(iii)). The disclaimer statement, when required, must accompany the claim each time it is used. In addition, the disclaimer statement is subject to the requirements of 21 CFR 101.2(c) and must appear prominently and conspicuously but in no case may the letters be less than one-sixteenth inch in height.

FDA encourages food manufacturers and distributors to review their labels and ensure that any food that bears a claim regarding the absence of sugar meet each of the requirements for that claim including the placement and conspicuousness of the disclaimer statement in 21 CFR 101.60(c)(1)(iii) when required. FDA will take appropriate action, consistent with our priorities and resources, when we find problems with the use of nutrient content claims regarding the absence of sugar in foods.

49.     Despite this guidance relating to claims regarding the absence of sugar and the FDA warning letters about improper sugar related nutrient content claims including improper "no sugar added" claims, Defendant did not change the labels on its Misbranded Food Products that contained the labeling claims that were in violation.

50.     Defendant also ignored the FDA's Guidance for Industry, A Food Labeling Guide, which details the FDA's guidance on how to make food labeling claims.

51.     Despite the FDA's numerous warnings to industry, Defendant continued to sell products bearing unlawful food labeling claims without meeting the requirements to make them. Defendant's Misbranded Food Products continue to run afoul of FDA guidance as well as federal and California law, as Defendant continues to utilize unlawful claims on the labels of its Misbranded Food Products.

52.     Plaintiffs did not know, and had no reason to know, that the Defendant's Misbranded Food Products were misbranded and bore food labeling claims despite failing to meet the requirements to make those food labeling claims.

53.     Pursuant to Section 403 of the FDCA, a claim that characterizes the level of a nutrient in a food is a "nutrient content claim" that must be made in accordance with the regulations that authorize the use of such claims. 21 U.S.C. § 343(r)(1)(A). California expressly adopted the requirements of 21 U.S.C. § 343(r) in § 110670 of the Sherman Law.

54.     Nutrient content claims are claims about specific nutrients contained in a product. They are typically made on food packaging in a font large enough to be read by the average consumer. Because consumers rely upon these claims when making purchasing decisions, the regulations govern what claims can be made in order to prevent misleading claims.

55.   Section 403(r)(1)(A) of the FDCA governs the use of expressed and implied nutrient content claims on labels of food products that are intended for sale for human consumption.

56.   21 C.F.R. § 101.13 provides the general requirements for nutrient content claims, which California has expressly adopted.  California Health & Safety Code § 110100.

57.   An "express nutrient content claim" is defined as any direct statement about the level (or range) of a nutrient in the food (*e.g.*, "low sodium" or "contains 100 calories"). *See* 21 C.F.R. § 101.13(b)(1).

58.   An "implied nutrient content claim" is defined as any claim that: (i) describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (*e.g.*, "high in oat bran"); or (ii) suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (*e.g.*, "healthy, contains 3 grams (g) of fat").  21 C.F.R. § 101.13(b)(2)(i-ii).

59.   FDA regulations authorize the use of a limited number of defined nutrient content claims.  In addition, FDA's regulations authorize the use of only certain synonyms for these defined terms.  If a nutrient content claim or its synonym is not included in the food labeling regulations, it cannot be used on a label.  Only those claims, or their synonyms, that are specifically defined in the regulations may be used.  All other claims are prohibited.  21 CFR §101.13(b).

60.   Only approved nutrient content claims will be permitted on the food label, and all other nutrient content claims will misbrand a food.  It should thus be clear which type of claim is prohibited and which permitted.  Food manufacturers are on notice that the use of an unapproved nutrient content claim is prohibited conduct.  58 FR 2302.  In addition, 21 USC §343(r)(2) prohibits using unauthorized undefined terms, and it declares foods that do so to be misbranded.

61.   Despite the clear directive, as described herein, prohibiting Defendant from making certain nutrient content claims, Defendant makes such claims.

62.   Misbranded products cannot be legally sold under California Law.  *See* Cal. Health and Safety Code § 110760. Misbranded products cannot be legally sold under Federal Law.  *See* 21 U.S.C. §§ 331, 333.

-17-

**C.**   **Defendant's Food Products Are Misbranded**

    **1.**   **Defendant Makes Unlawful "No Sugar Added" Nutrient Content Claims**

63.   Federal and California law regulates "no sugar added" claims as a particular type of nutrient content claim.  Specifically, 21 C.F.R. § 101.60 contains special requirements for nutrient claims that use the phrase "no sugar added."   Pursuant to the Sherman Law, California has expressly adopted the federal labeling requirements of 21 C.F.R. § 101.60 as its own.   California Health & Safety Code § 110100.

64.   Defendant claims that several of its products have "No Sugar Added."  For instance, the labels of Defendant's "100% Juice" products, including Grape, White Grape, White Grape Cherry and Black Cherry Concord Grape flavors, prominently state "No Sugar Added" on the front of the labels.

65.   21 C.F.R. § 101.60(c)(2) provides in pertinent part, with emphasis added:

(2) The terms "no added sugar," "without added sugar," or "*no sugar added*" may be used only if:

(i) No amount of sugars, as defined in §101.9(c)(6)(ii), or any other ingredient that contains sugars that functionally substitute for added sugars is added during processing or packaging; and

(ii) The product does not contain an ingredient containing added sugars such as jam, jelly, or *concentrated fruit juice*; and

(iii) The sugars content has not been increased above the amount present in the ingredients by some means such as the use of enzymes, except where the intended functional effect of the process is not to increase the sugars content of a food, and a functionally insignificant increase in sugars results; and

(iv) The food that it resembles and for which it substitutes normally contains added sugars; and

(v) *The product bears a statement that the food is not "low calorie" or "calorie reduced"* (unless the food meets the requirements for a "low" or "reduced calorie" food) *and that directs consumers' attention to the nutrition panel for further information on sugar and calorie content*.

66.   21 C.F.R. § 101.60(b)(2) provides that:

The terms "low-calorie," "few calories," "contains a small amount of calories," "low source of calories," or "low in calories" may be used on the label or in

labeling of foods, except meal products as defined in § 101.13(l) and main dish products as defined in § 101.13(m), provided that: (i)(A) The food has a reference amount customarily consumed greater than 30 grams (g) or greater than 2 tablespoons and does not provide more than 40 calories per reference amount customarily consumed; or (B) The food has a reference amount customarily consumed of 30 g or less or 2 tablespoons or less and does not provide more than 40 calories per reference amount customarily consumed and, except for sugar substitutes, per 50 g ....(ii) If a food meets these conditions without the benefit of special processing, alteration, formulation, or reformulation to vary the caloric content, it is labeled to clearly refer to all foods of its type and not merely to the particular brand to which the label attaches (e.g., "celery, a low-calorie food").

67.     The principal display panel of Defendant's Misbranded Food Products states that the products contain "no sugar added."   Defendant's Misbranded Food Products do not satisfy elements (ii) and (v) of 21 C.F.R. § 101.60(c)(2) and are therefore misbranded under federal and state law.

68.     Notwithstanding the fact that 21 C.F.R. § 101.60(c)(2)(ii) bars the use of the term "no sugar added" on products containing an ingredient containing added sugars such as concentrated fruit juice, Defendant has touted its Misbranded Food Products as having "no sugar added" despite the addition of those ingredients.

69.     Notwithstanding the fact that 21 C.F.R. § 101.60(c)(2)(v) bars the use of the term "no sugar added" on foods that are not low-calorie unless they bear an express warning immediately adjacent to each use of the terms that discloses that the food is not "low calorie" or "calorie reduced," Defendant has touted its non low-calorie products as having "no sugar added" and chosen to omit the mandated disclosure statements.

70.     In doing so, Defendant has ignored the language of 21 C.F.R. § 101.60(c)(1) that states that:

> Consumers may reasonably be expected to regard terms that represent that the food contains no sugars or sweeteners e.g., "sugar free," or "no sugar," as indicating a product which is low in calories or significantly reduced in calories.

71.     Consumers may reasonably be expected to regard terms that represent that food contains "no sugar added" or sweeteners as indicating a product which is low in calories or significantly reduced in calories.   Consumers are misled when foods that are not low-calorie as a

-19-

matter of law are falsely represented to be low-calorie through the unlawful use of phrases like "no sugar added."

72.     The labeling for Defendant's product violates California law and federal law.  For these reasons, Defendant's "no sugar added" claims at issue in this Complaint are misleading and in violation of 21 C.F.R. §§ 1.21 and 101.60(c)(2) and California law, and the products at issue are misbranded as a matter of law.  Misbranded products cannot be legally sold and have no economic value and are legally worthless.

73.     Defendant's no sugar added claims are particularly difficult to justify given that during the class period the Defendant has continuously maintained that its products had no sugar added while it simultaneously  varied the amount of sugar and calories it used to formulate its "100% grape juice." Thus, during the class period the Defendant has manufactured grape juice that has ranged from at least 36 to 40 grams of sugar and from at least 140 to 170 calories per stated serving size. It thus appears that at different points in time the Defendant has chosen to  vary the sweetness and sugar content of its juice by varying the amount of grape juice by adjusting the amount of water and grape juice concentrate (which is regulated under the sugar rules of  21 C.F.R. §101. 60) it uses to reconstitute its "100% juice."

74.     Defendant has also made the same illegal claims on its websites and advertising in violation of federal and California law.

75.     Defendant is in violation despite numerous enforcement actions and warning letters pertaining to several other companies addressing the type of misleading sugar-related nutrient content claims described herein.

76.     Plaintiffs did not know, and had no reason to know, that Defendant's Misbranded Food Products were misbranded, and bore nutrient content claims despite failing to meet the requirements to make those nutrient content claims.

77.     Defendant's products in this respect are misbranded under federal and California law. Some of the Defendant's products purchased by Plaintiffs that are labeled with a "No Sugar Added" or similar sugar-related nutrient content claim contain disqualifying levels of calories that prohibit the claim from being made absent a mandated disclosure statement warning of the higher caloric

level of the products and thus violate 21 CFR §§1.21 and 101.60(c)(2).

78.    Because of these improper nutrient content claims, Plaintiffs purchased these products and paid a premium for them. The nutrient content claims regulations discussed herein are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products. Defendant has violated these referenced regulations.

Therefore, Defendant's Misbranded Food Products are misbranded as a matter of federal and California law and cannot be sold or held because they have no economic value and are legally worthless.

### 2. Defendant Makes Unlawful No Artificial Flavors, Colors or Preservatives Claims

79.    Federal law provides that a food may be deemed to be misbranded if its labeling is false or misleading in any particular. 21 U.S.C. §§ 343(a)(1). California law has an identical provision (California Health & Safety Code § 110660). Defendant's Misbranded Food Products violate these provisions by bearing labels that claim that the products are free from artificial flavors, colors or preservatives despite containing artificial flavors, colors or preservatives such as ascorbic acid, potassium metabisulfate, sodium citrate, and/or citric acid. For instance, the labels of Defendant's 100% Grape and White Cherry Grape juices, state they are free from artificial flavors or preservatives despite containing artificial flavors or preservatives such as citric acid and ascorbic acid. Similarly, the label of the Defendant's "Natural" Grape Spread states the product is free from artificial flavors, colors or preservatives despite containing artificial flavors, colors or preservatives such as citric acid and sodium citrate. Similarly, the labels of the Defendant's grape jam and grape jelly indicated they had no artificial flavors or colors but contained high fructose corn syrup and citric acid and sodium citrate.

80.    Ascorbic acid, citric acid, and sodium citrate are chemicals used to preserve food and/or impart tart flavor to products that lack such flavor naturally. Artificial high fructose corn syrup is used by Defendant as a flavor.

81.    The FDA has repeatedly targeted products that made claims that they were natural despite containing artificial ingredients such as citric acid and other chemical preservatives.

82. Section 403(a) of the FDCA and California's Sherman Law prohibit food manufacturers from using labels that claim to be natural or non-artificial when they contain artificial ingredients and flavorings, added coloring and chemical preservatives.

83. The FDA considers use of the term "natural" on a food label to be truthful and non-misleading when "nothing artificial or synthetic...has been included in, or has been added to, a food that would not normally be expected to be in the food." *See* 58 FR 2302, 2407, January 6, 1993.

84. Any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources. The FDA distinguishes between natural and artificial flavors in 21 C.F.R. § 101.22.

85. The FDA has also repeatedly affirmed its policy regarding the use of the term "natural" as meaning that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food. Any coloring or preservative can preclude the use of the term "natural" even if the coloring or preservative is derived from natural sources.

86. The FDA has sent out numerous warning letters to companies in which it has addressed natural type claims. In these letters, the FDA has informed the receiving companies that their products represented as being natural were misbranded where they contained synthetic and artificial ingredients.

87. For example, on August 16, 2001, the FDA sent a warning letter to Oak Tree Farm Dairy, Inc. ("Oak Tree warning letter"). The letter "found serious violations" of the Federal Food, Drug and Cosmetic Act and Title 21, Code of Federal Regulations, Part 101 – Food Labeling (21 CFR 101), and stated in pertinent part:

> The term "all natural" on the "OAKTREE ALL NATURAL LEMONADE" label is inappropriate because the product contains potassium sorbate. Although FDA has not established a regulatory definition for "natural," we discussed its use in the preamble to the food labeling final regulations (58 Federal Register 2407, January 6, 1993, copy enclosed). FDA's policy regarding the use of "natural," means nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected to be in the food. The same comment applies to use of the terms "100 % NATURAL" and "ALL NATURAL" on the "OAKTREE REAL BREWED ICED TEA" label because it contains citric acid.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2001/ucm178712.htm

88.     Similarly, on November 16, 2011, the FDA sent a warning letter to Alexia Foods, Inc., informing Alexia of its failure to comply with the requirements of the Federal Food, Drug and Cosmetic Act and Title 21, Code of Federal Regulations, Part 101 – Food Labeling (21 CFR 101) ("Alexia Warning Letter"). The Alexia Warning Letter stated, in pertinent part:

> The U.S. Food and Drug Administration (FDA) has reviewed the labels for your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms products. Based on our review, we have concluded that these products are in violation of the Federal Food, Drug, and Cosmetic Act (the Act). You can find copies of the Act and the FDA regulations through links in FDA's home page at http://www.fda.gov.

> Your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms product is misbranded within the meaning of section 403(a)(1) of the Act [21 U.S.C. 343(a)(1)], which states that a food shall be deemed to be misbranded if its labeling is false or misleading in any particular. The phrase "All Natural" appears at the top of the principal display panel on the label. FDA considers use of the term "natural" on a food label to be truthful and non-misleading when "nothing artificial or synthetic…has been included in, or has been added to, a food that would not normally be expected to be in the food." [58 FR 2302, 2407, January 6, 1993].

> Your Alexia brand Roasted Red Potatoes & Baby Portabella Mushrooms product contains disodium dihydrogen pyrophosphate, which is a synthetic chemical preservative. Because your products contain this synthetic ingredient, the use of the claim "All Natural" on this product label is false and misleading, and therefore your product is misbranded under section 403(a)(1) of the Act.

> We note that your Alexia brand products market a number of food products with the "All Natural" statement on the label. We recommend that you review all of your product labels to be consistent with our policy to avoid additional misbranding of your food products.

> This letter is not intended to be an all-inclusive review of your products and their labeling. It is your responsibility to ensure that all of your products and labeling comply with the Act and its implementing regulations. You should take prompt action to correct the violations cited in this letter. Failure to do so may result in enforcement action without further notice. Such action may include, but is not limited to, seizure or injunction.

> http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm281118.htm

89.     Defendant knew or should have known of these warning letters and other similar ones. Despite FDA's numerous warnings to industry, Defendant has continued to sell products

-23-

represented as being natural or non-artificial which contain artificial and synthetic ingredients and added coloring.  Seeking to profit from consumers' desire for natural food products, Defendant has falsely misrepresented its products purchased by Plaintiffs and similar products in its product line as being natural or non-artificial.

90.    Defendant has also made the same false, misleading and illegal claims on other food products in violation of federal and California law.

91.    A reasonable consumer would expect that when Defendant labels its products as being all natural, free from artificial colors, flavors or preservatives, the products are all actually 100% natural or free from artificial colors, flavors or preservatives defined by the federal government and its agencies.  A reasonable consumer would also expect that when Defendant labels its products all natural, free from artificial colors, flavors or preservatives, the product ingredients are actually free from artificial colors, flavors or preservatives according to the common use of that word.

92.    Plaintiffs did not know, and had no reason to know, that Defendant's Misbranded Food Products were misbranded, and bore claims of being, all natural, free from artificial colors, flavors or preservatives despite their failure to meet the requirements necessary to make these claims.

93.    Consumers are thus misled into purchasing Defendant's products with synthetic and artificial ingredients that falsely represented on their labeling to be natural.

94.    Defendant's products are in this respect misbranded under federal and California law.  Misbranded products cannot be legally sold and have no economic value and are legally worthless.  Plaintiffs and members of the Class who purchased these products paid an unwarranted premium for these products.

**3.    Defendant Makes Unlawful Antioxidant Claims**

95.    A reasonable person would also attach importance to whether Defendant's products were legally salable and capable of legal possession and to Defendant's representations about these issues in determining whether to purchase the products at issue.    Plaintiffs would not have purchased the Defendant's Misbranded Food Products had they known they were not capable of

-24-

being legally sold or held. Defendant has repeatedly made unlawful nutrient content claims about antioxidants and other nutrients that fail to utilize one of the limited defined terms appropriately. For instance, the label of the Light Concord Grape beverage purchased by Plaintiffs claim that it is "High in Antioxidants." However, this is false because the product is not high in any recognized antioxidant other than the added Vitamin C added to the beverage. Similarly, the label of some of Defendant's products purchased by Plaintiffs during the class period, including but not limited to, White Grape and White Grape Cherry Juices contain links to Welch's own website wherein Defendant has stated that its grape containing products as "packed with phenols" and "twice the natural antioxidant power of orange juice" despite lacking the minimum nutritional levels to make such a claim. Because Defendant provides the web address for its website on all of its product labels, the nutrient content claims on its website are deemed part of the product labeling. As such, each of Defendant's products with the aforementioned web address on the product label are misbranded.

96.    In fact, in promoting the purported antioxidant properties of its products and their purported health properties, Welch's makes numerous unlawful antioxidant claims. Welch's also makes unlawful flavonoid and polyphenol claims using regulated terms like "rich" that Welch's products fail to meet the requirements to make. For example on its website Welch's claims:

Welch's 100% Grape Juice is naturally abundant in protective antioxidants

It may surprise you to learn that Welch's 100% Grape Juice, made from Welch's own Concord grapes, recently ranked #1 in antioxidant capacity per serving among all juices and beverages tested in an independent study of 1000+ common foods.1 In fact, Welch's Grape Juice has more than twice the natural antioxidant power of orange juice.

The natural antioxidant power of fruits and vegetables comes from certain natural plant compounds. Concord grapes are abundant sources of natural plant compounds called polyphenols and, in particular, contain a subgroup of polyphenols called flavonoids. When we make our juices we press the whole grapes, straight from the vines, with skins and seeds intact. Because polyphenols are typically found in the seeds and skins, these natural plant nutrients are transferred into the juice during the press, making our purple 100% Grape Juice an antioxidant superstar.

But not all grape juices are the same. Many purple grape juices are not made from antioxidant rich Concord grapes and, consequently, those juices may have significantly less total antioxidant capacity.

Antioxidants and Health

Over ten years of scientific research supports that drinking antioxidant-rich Concord grape juice assists with healthy cardiovascular function. Emerging science further suggests that eating a diet high in natural antioxidants such as those found in Concord grape juice may slow down the effects of aging, such as by protecting memory and reducing the signs of skin aging.

To learn more, click on Heart Health & More.

What are Antioxidants and how do they work?

Antioxidants are compounds that act as cell protectors by slowing oxidation. They help the body neutralize the dangerous effects of unattached oxygen molecules (sometimes called free radicals) in the body. If you've ever seen an old car rusting in a junkyard, that gives you some sense of what would be happening inside your body without antioxidants. But instead of forming rust, free radicals attack otherwise healthy cells and may damage or even kill them. This damage from oxidation is often termed oxidative stress.

Our bodies produce free radicals for a number of reasons. Some are just a natural byproduct of various physiological functions like eating and exercising. Others are produced when we are exposed to external factors. For example, exposure to cigarette smoke—even second hand smoke-triggers production of free radicals in the body. The National Cancer Institute states that "free radicals may play a part in cancer, heart disease, stroke and other diseases of aging."3

If you consume a diet rich in natural antioxidants, you are helping it keep these free radicals and their potential negative effects in check. The best way to get your antioxidants is to eat a diet rich in plant sources of antioxidants such as vegetables, fruits and fruit juices.

Drink Welch's 100% Grape Juice daily – it's a delicious way to add natural antioxidants to your diet – your heart and your body will thank you.

97.    These nutrient content claims are unlawful because they fail to comply with the nutrient content claim provisions in violation of 21 C.F.R. §§ 101.13 and 101.54, which have been incorporated in California's Sherman Law.

98.    For example, the Light Concord grape beverage lacks any antioxidant other than the added Vitamin C that is present at the 20% of the Daily Value required by 21 C.F.R. § 101.54 for a "high" nutrient content claim. Similarly, no natural antioxidants are present at the 20% Daily Value level required by 21 C.F.R. § 101.54 for a "rich" nutrient content claim. Similarly, Defendant's Grape and White Grape Juices do not meet the minimum nutrient level threshold to make such a

claim because it bases its claims in part on the amount of "natural antioxidants" or polyphenols that Defendant alleges exist in its grape products.  This is an unauthorized nutrient claim pursuant to § 403(r)(1)(B) of the FDCA in that there is no Daily Value established for polyphenols.  Because the claim is not authorized as a nutrient content claim by regulation or by the FDCA, it misbrands the product.

99.     These very same violations over nutrient content claims were condemned by the FDA in a November 22, 2000 Warning Letter to Pavich Family Farms over an improper antioxidant claim for its seedless grapes. The letter stated in part:

> The Food and Drug Administration (FDA) has reviewed the label for your product "PAVICH BRAND ORGANIC* **CRIMSON SEEDLESS***" grapes. We have concluded that this label causes the above product to be in violation of section 403 of the Federal Food, Drug, and Cosmetic Act (the act).

> Pavich Brand Organic Crimson Seedless Grapes are misbranded because the label bears health claims that are not authorized by regulation or the act (See 403(r)(l)(B)). The unauthorized health claims include"* **antioxidants found in grapes, like Resveratrol, help boost the body's immune system and therefore help fight diseases including cancer and heart disease" and "Plus, grapes are a rich source of Vitamin C which strengthens blood and helps the body heal faster."

> The product is also misbranded because the label bears a nutrient content claim that is not authorized by regulation or the act (See 403(r)( 1)(A)). The unauthorized nutrient content claim "Contain Resveratrol" implies that the food is a "good source" of resveratrol. There is no Daily Value established for resveratrol; therefore, this claim cannot appear on the label of this product. Because the claim is not authorized as a nutrient content claim by regulation
> or by the act, it misbrands the product.

100.     Moreover, these very same violations over nutrient content claims were condemned in the August 23, 2010 FDA Warning Letter to Unilever/Lipton in which the FDA stated, in part:

> A link to your website, www.lipton.com appears on your "Lipton Green Tea 100% Natural Naturally Decaffeinated" product label. This website directs U.S. visitors to another website, www.liptont.com. We have determined that your websites, www.lipton.com and www.liptont.com are labeling within the meaning of section 201(m) of the Act for your "Lipton Green Tea 100% Natural Naturally Decaffeinated" product.

> The product label back panel includes the statement "packed with protective FLAVONOID ANTIOXIDANTS." The term "packed with" characterizes the level

-27-

of flavonoid antioxidants in the product; therefore, this claim is a nutrient content claim (see section 403(r)(1) of the Act and 21 CFR 101.13(b)). Even if we determined that the term "packed with" could be considered a synonym for a term defined by regulation, nutrient content claims that use the term "antioxidant" must meet the requirements of 21 CFR 101.54(g). **The claim "packed with FLAVONOID ANTIOXIDANTS" does not comply with 21 CFR 101.54(g)1) because no RDI has been established for flavonoids. Thus, this unauthorized nutrient content claim causes your product to be misbranded** under section 403(r)(2)(A)(i) of the Act.

Just as the FDA found Unilever's use of the phrase "packed with flavonoid antioxidants" to be in violation of law, Defendant's use on package labels of terms such as "loaded with antioxidants" is in violation of law. Therefore, as with Pavich Family Farms and Unilever, such a violation causes Defendant's products "to be misbranded under section 403(r)(2)(A)(i) of the Act."

101.   The nutrient content claims regulations discussed above are intended to ensure that consumers are not misled as to the actual or relative levels of nutrients in food products.

102.   Defendant has violated these referenced regulations. Therefore, Defendant's Misbranded Food Products are misbranded as a matter of federal and California law and cannot be sold or held because they have no economic value and are legally worthless. Defendant has also violated 21 C.F.R. § 101.54(g)(1), which prohibits food manufacturers from making claims regarding the nutritional value of their products when the products fail to disclose that no RDI has been established for the touted nutrients.

103.   Plaintiffs did not know, and had no reason to know, that Defendant's Misbranded Food Products were misbranded, and bore improper and illegal claims of being "packed with phenols [antioxidants]" their failure to meet the requirements necessary to make these claims.

104.   Consumers are thus misled into purchasing Defendant's products with improper antioxidant claim as falsely were represented on their labeling.

105.   Defendant's products are in this respect misbranded under federal and California law. Misbranded products cannot be legally sold and have no economic value and are legally

1   worthless.  Plaintiffs and members of the Class who purchased these products paid an unwarranted

2   premium for these products.

### 4.   Defendant Makes Unlawful Health Claims

4   106.   Defendant has violated identical California and federal law by making numerous

5   unapproved health claims about its products.  It has also violated identical California and federal

6   law by making numerous unapproved claims about the ability of its products to cure, mitigate, treat

7   and prevent various diseases that render its products unapproved drugs under California and federal

8   law. Moreover, in promoting the ability of its Misbranded Food Products to have an effect on

9   certain diseases such as heart disease, Defendant has violated the advertising provisions of the

10  Sherman law.

11  107.   A health claim is a statement expressly or implicitly linking the consumption of a

12  food substance (*e.g.*, ingredient, nutrient, or complete food) to risk of a disease (*e.g.*, cardiovascular

13  disease) or a health-related condition (*e.g.*, hypertension). *See* 21 C.F.R. §101.14(a)(1), (a)(2), and

14  (a)(5). Only health claims made in accordance with FDCA requirements, or authorized by FDA as

15  qualified health claims, may be included in food labeling. Other express or implied statements that

16  constitute health claims, but that do not meet statutory requirements, are prohibited in labeling

17  foods.

18  108.   21 C.F.R. § 101.14, which has been expressly adopted by California, provides when

19  and how a manufacturer may make a health claim about its product.  A "Health Claim" means any

20  claim made on the label or in labeling of a food, including a dietary supplement, that expressly or

21  by implication, including "third party" references, written statements (*e.g.*, a brand name including

22  a term such as "heart"), symbols (*e.g.*, a heart symbol), or vignettes, characterizes the relationship

23  of any substance to a disease or health-related condition. Implied health claims include those

24  statements, symbols, vignettes, or other forms of communication that suggest, within the context in

25  which they are presented, that a relationship exists between the presence or level of a substance in

26  the food and a disease or health-related condition (*see* 21 CFR § 101.14(a)(1)). Defendant uses both

27  text and symbols such as hearts to promote the healthiness and health benefits of its products.

28

109.   Further, health claims are limited to claims about disease risk reduction, and cannot be claims about the diagnosis, cure, mitigation, or treatment of disease. An example of an authorized health claim is: "Three grams of soluble fiber from oatmeal daily in a diet low in saturated fat and cholesterol may reduce the risk of heart disease. This cereal has 2 grams per serving."

110.   A claim that a substance may be used in the diagnosis, cure, mitigation, treatment, or prevention of a disease is a drug claim and may not be made for a food. 21 U.S.C. § 321(g)(1)(D).

111.   The use of the term "healthy" is not a health claim but rather an implied nutrient content claim about general nutrition that is defined by FDA regulation. In general, the term may be used in labeling an individual food product that:

> Qualifies as both low fat and low saturated fat;
> Contains 480 mg or less of sodium per reference amount and per labeled serving, and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;
>
> Does not exceed the disclosure level for cholesterol (*e.g.*, for most individual food products, 60 mg or less per reference amount and per labeled serving size); *and*
>
> Except for raw fruits and vegetables, certain frozen or canned fruits and vegetables, and enriched cereal-grain products that conform to a standard of identity, provides at least 10% of the daily value (DV) of vitamin A, vitamin C, calcium, iron, protein, *or* fiber per reference amount. Where eligibility is based on a nutrient that has been added to the food, such fortification must comply with FDA's fortification policy.

21 C.F.R. § 101.65(d)(2).   Defendant is aware of this rule.

112.   The FDA's regulation on the use of the term healthy also encompasses other, derivative uses of the term health (*e.g.*, healthful, healthier) in food labeling. 21 C.F.R. § 101.65(d).

113.   Defendant has violated the provisions of § 21 C.F.R. §101.14, 21 C.F.R. §101.65, 21 C.F.R. §101.75, 21 U.S.C. § 321(g)(1)(D) and 21 U.S.C. § 352(f)(1) by including certain claims on its product labeling.   Despite being aware of the criteria and restrictions that pertain to "healthy" claims, Defendant makes numerous unlawful "healthy" claims about its Misbranded Food Products

and their components. Defendant indicates that these products and their ingredients are "healthy". Defendant does this in violation of 21 C.F.R. §101.65 which has been adopted by California and which precludes the use of these terms about Defendant's products such as the grape food products purchased by Plaintiffs which fail to meet the minimum nutritional levels for a healthy claim.

114.    In addition to its unlawful "healthy" claims, Defendant makes unlawful health related claims. For example, Defendant claims that the ingredients in its grape food products such as the grape juice bought by the Plaintiffs.

115.    For example the Defendant states:

At the heart of Welch's 100% Grape Juice is the goodness of the Concord grape. This little purple fruit provides a powerful and unrivaled combination of great taste and health benefits. It's not only delicious, but is also loaded with natural plant nutrients which act as powerful antioxidants and may be protective of our health in a variety of ways.

Nutrition experts tell us that an assortment of colorful fruits and vegetables in our diets will ensure we get a wide variety of healthful plant nutrients. While many of us don't eat enough fruits and vegetables in general, it is the purple/blue category that is the most underrepresented. Only three percent of Americans' fruit and vegetable intake is from the purple/blue category, which means people are missing out on some of the valuable plant nutrients specific to this color group. Within the purple/blue category, juice from Concord grapes provides an amazing amount of these important plant nutrients, and it's an easy way to get your purple everyday!

So make Welch's 100% Grape Juice your choice and start enjoying all the benefits:

Welch's 100% Grape Juice is made from Welch's own Concord grapes with absolutely NO sugar added.

Welch's 100% Grape Juice is naturally abundant in antioxidant power!
Welch's 100% Grape Juice can help promote a healthy heart and arteries and more!

Welch's 100% Grape Juice, a heart healthy juice with no fat or cholesterol, is certified by the American Heart Association.

116.    Defendant promotes its grape products for the prevention and treatment of numerous conditions including but not limited to Alzheimer's disease, high blood pressure, high or bad cholesterol, and cardiovascular disease.

117.    The therapeutic claims on Defendant's labeling establish that Defendant's products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of

disease. Defendant's products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products would be "new drug[s]" under section 201(p) of the Act [21 U.S.C. § 321(p)]. New drugs may not be legally marketed in the U.S. without prior approval from the FDA as described in section 505(a) of the Act [21 U.S.C. § 355(a)]. FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective. Defendant also violated California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect  on enumerated conditions, disorders and diseases including cancer and heart diseases unless the materials have federal approval.

118.    The Defendant's claims are not only unlawful but they also are misleading or false as well. For example the grape juice supplied by Welch's that was used in numerous studies are different in character and nutritional properties from the grape juice Welch's sells and uses the studies to promote. Similarly, various claims made by Welch's are not borne out by the studies in question.  Thus, for example, Welch's claim that "that daily, moderate consumption of Concord grape juice did not impact weight" is premised on a study where the participants drinking Welch's grape juice actually gained weight and increased their body mass index.

119.    In addition, Defendant's claims about the health properties of its grape products based on the specific health properties of Concord and Niagara grapes are misleading when upon information and belief Welch's 100% grape juice products are actually blends of different varietal grapes that lack the full health properties attributed to Concord and Niagara grapes. Moreover, given the fact, based on information and belief, that Defendant blends less desirable grape varietals into its juices which they declare on its non-American labels, Welch's claims that its purple 100% grape juice was "made with Welch's own CONCORD GRAPES" or that its white 100% grape juice was "made with Welch's own NIAGARA GRAPES" is false and misleading. Plaintiffs thought they was buying pure Concord grape juice when they purchased Welch's purple 100% grape juice and pure Niagara grape juice when they purchased Welch's white 100% grape juice and would not have bought such products had they not relied on the truthfulness of the representations on the labels in question. Plaintiffs would not have bought the products or paid the premiums they paid for

-32-

such products had they known they were blends consisting of something less than 100% Concord grape juice or 100% Niagara grape juice. Welch's documents indicate that it prices products at different price points based on their grape juice content and that different grape juice varieties have higher and lower values.

120. Defendant also includes specific unlawful health claims on the packaging of its products despite failing to meet the minimum nutritional requirements for making such claims. For example, the Defendant included the heart disease related health claim specified in 21 C.F.R. §101.75 on the packaging of the 100% grape juice bought by the Plaintiffs despite failing to meet the minimum nutritional requirement mandated by law before such a claim is permitted.

121. Plaintiffs saw such health related claims and relied on Defendant's health claims which influenced their decision to purchase Defendant's products. Plaintiffs would not have bought the products had they known Defendant's claims were unapproved and that the products were thus misbranded.

122. Plaintiffs and members of the Class were misled into the belief that such claims were legal and had passed regulatory muster and were supported by science capable of securing regulatory acceptance. Because this was not the case, Plaintiffs and members of the Class have been deceived.

123. Defendant's materials and advertisements not only violate regulations adopted by California such as 21 C.F.R. § 101.14, they also violate California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect on enumerated conditions, disorders and diseases including heart disease unless the materials have federal approval.

124. Plaintiffs and members of the Class have been misled by Defendant's unlawful labeling practices and actions into purchasing products they would not have otherwise purchased had they known the truth about these products. Plaintiffs and members of the Class who purchased these products paid an unwarranted premium for these products.

125.     Defendant's health related claims are false and misleading and the products are in this respect misbranded under identical California and federal laws. Misbranded products cannot be legally sold and thus have no economic value and are legally worthless.

**5.     Defendant Has Violated California Law**

126.     Defendant has manufactured, advertised, distributed, and sold products that are misbranded under California law.   Misbranded products cannot be legally manufactured, advertised, distributed, sold or held, and have no economic value and are legally worthless as a matter of law.

127.     Defendant has violated California Health & Safety Code §§ 109885 and 110390 which make it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

128.     Defendant has violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold, or offer to sell any falsely advertised food.

129.     Defendant has violated California Health & Safety Code §§ 110398 and 110400 which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely advertised.

130.     Defendant has violated California Health & Safety Code § 110403 which prohibits the advertisement of products that are represented to have any effect on enumerated conditions, disorders and diseases including cancer and heart diseases unless it has federal approval.

131.     Defendant's food products are misbranded under California Health & Safety Code § 110660 because its labeling is false and misleading in one or more ways.

132.     Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110665 because their labeling fails to conform to the requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted thereto.

133.     Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110670 because their labeling fails to conform with the requirements for nutrient content claims set forth in 21 U.S.C. § 343(r) and the regulations adopted thereto.

-34-

134.     Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110705 because words, statements, and other information required by the Sherman Law to appear on their labeling either are missing or not sufficiently conspicuous.

135.     Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110740 because they contain artificial flavoring, artificial coloring, and chemical preservatives but fail to adequately disclose that fact on its labeling.

136.     Defendant's Misbranded Food Products are misbranded under California Health & Safety Code § 110755 because they purport to be or are represented for special dietary uses, and its labels fail to bear such information concerning its vitamin, mineral, and other dietary properties as the Secretary determines to be, and by regulations prescribes as, necessary in order fully to inform purchasers as to its value for such uses.

137.     Defendant has violated California Health & Safety Code § 110760 which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.

138.     Defendant has violated California Health & Safety Code § 110765 which makes it unlawful for any person to misbrand any food.

139.     Defendant has violated California Health & Safety Code § 110770 which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

140.     Defendant has violated the standard set by 21 C.F.R. § 101.2, which has been incorporated by reference in the Sherman Law, by failing to include on its product labels the nutritional information required by law.

141.     Defendant has violated the standards set by 21 CFR §§ 101.13, 101.54, 101.60, 101.65, and 104.20 which have been adopted by reference in the Sherman Law, by including unauthorized nutrient content claims on its products.

142.     Defendant's labeling, advertising, and marketing as alleged herein is false and misleading and designed to increase sales of the products at issue. Defendant's misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person

1  would attach importance to Defendant's representations in determining whether to purchase the

2  products at issue.  A reasonable person would attach importance to whether Defendant's products

3  were legally salable and capable of legal possession and to Defendant's representations about these

4  issues in determining whether to purchase the products at issue. Plaintiffs would not have purchased

5  Defendant's Misbranded Food Products had they known they were not capable of being legally sold

6  or held.

7       **6.       Plaintiffs Purchased Defendant's Products**

8       143.    Plaintiffs read and reasonably relied on the labels on Defendant's products,

9  including but not limited to labels stating "no sugar added," and representations of being natural or

10  non-artificial before purchasing them.

11      144.    Plaintiffs, during the class period of the last 4 years, purchased greater than $25.00

12  of Defendant's Grape, White Grape, White Grape Cherry and Black Cherry 100% Juices,

13  Defendant's Light Concord Grape beverage and Defendant's Grape Jelly, Grape Jam and "Natural"

14  Spreads.

15      145.    Defendant's labeling claims were a substantial factor in Plaintiffs' decisions to

16  purchase Defendant's products.  Based on Defendant's claims, Plaintiffs believed that the products

17  were a better and healthier choice than other available products.

18      146.    Plaintiffs reasonably relied on Defendant's package labeling.

19      147.    At point of sale, Plaintiffs did not know, and had no reason to know, that

20  Defendant's products were misbranded as set forth herein, and would not have bought the products

21  had they known the truth about them, including but not limited to the fact that each was illegal to

22  purchase, own or hold.

23      148.    At point of sale, Plaintiffs did not know, and had no reason to know, that

24  Defendant's no sugar added, antioxidant and health claims, and representations of being natural or

25  non-artificial on the products' labels were unlawful as set forth herein, and would not have bought

26  the products had they known the truth about them.

27      149.    As a result of Defendant's misrepresentations, Plaintiffs and thousands of others in

28  California purchased the products at issue.

150.     Defendant's labeling, advertising, and marketing as alleged herein is false and misleading and designed to increase sales of the products at issue.  Defendant's misrepresentations are part of an extensive labeling, advertising and marketing campaign, and a reasonable person would attach importance to Defendant's representations in determining whether to purchase the products at issue.

## CLASS ACTION ALLEGATIONS

151.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following classes:

**Nationwide and California Class**: All persons in the United States, and   alternatively, in a sub-class in the state of California who, within the last four years, purchased any of Defendant's products:

(1) labeled "No Sugar Added" but which (a) contained concentrated fruit juice and/or (b) provided more than 40 calories per reference amount customarily consumed but which failed to bear a statement (i) disclosing that the product was not "low calorie" or "calorie reduced" and (ii) directing consumers' attention to the nutrition panel for further information on sugar and calorie content;

(2) represented to contain no artificial colors, flavors or preservatives but which contained artificial colors, flavors or preservatives;

(3) represented to be 100% natural but containing artificial colors, flavors or preservatives;

(4)  labeled or advertised as healthy despite failing to meet the minimum nutrient levels listed in 21 C.F.R. § 101.65; or(5) labeled or advertised with an unauthorized health claim (referred to herein as "the Class").

152.     The following persons are expressly excluded from the Class:  (1) Defendant and its subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and its staff.

153.     This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

154.   Numerosity:  Based upon Defendant's publicly available sales data with respect to the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that joinder of all Class members is impracticable.

155.   Common Questions Predominate:  This action involves common questions of law and fact applicable to each Class member that predominate over questions that affect only individual Class members.  Thus, proof of a common set of facts will establish the right of each Class member to recover.  Questions of law and fact common to each Class member include, for example:

a.  Whether Defendant engaged in unlawful, unfair or deceptive business practices by failing to properly package and label its Misbranded Food Products sold to consumers;

b.  Whether the food products at issue were misbranded or unlawfully packaged and labeled as a matter of law;

c.  Whether Defendant made unlawful and misleading "no sugar added" claims with respect to its food products sold to consumers;

d.  Whether Defendant made unlawful and misleading express or implied antioxidant, nutrient content or health claims with respect to its food products sold to consumers;

e.  Whether Defendant made unlawful and misleading representations that its products were free from artificial colors, flavors or preservatives

f.  Whether Defendant failed to adequately disclose the calorie or sugar content of its food products sold to consumers;

g.  Whether Defendant violated California Bus. & Prof. Code § 17200 *et seq.*, California Bus. & Prof. Code § 17500 *et seq.*, the California Consumers Legal Remedies Act, Cal. Civ. Code. § 1750 *et seq.*, and the Sherman Law;

h.  Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

i.  Whether Defendant's unlawful, unfair and/or deceptive practices harmed Plaintiffs and the Class; and

j.  Whether Defendant was unjustly enriched by its deceptive practices.

156.   Typicality:  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs bought Defendant's Misbranded Food Products during the Class Period.  Defendant's unlawful, unfair, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiffs and the Class sustained similar injuries arising out of Defendant's conduct in violation of California law.  The injuries of each member of

-38-

the Class were caused directly by Defendant's wrongful conduct. In addition, the factual underpinning of Defendant's misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

157.    Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor Plaintiffs' counsel have any interests that conflict with or are antagonistic to the interests of the Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

158.    Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

159.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to FED. R. CIV. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

160.     The prerequisites to maintaining a class action pursuant to FED. R. CIV. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

161.     Plaintiffs and Plaintiffs counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

162.     For each cause of action herein alleged, Plaintiffs hereby reallege and incorporate the foregoing paragraphs.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Business and Professions Code § 17200, *et seq.***
**Unlawful Business Acts and Practices**

163.     Plaintiffs incorporate by reference each allegation set forth above.

164.     Defendant's conduct constitutes unlawful business acts and practices.

165.     Defendant sold Misbranded Food Products in California during the Class Period.

166.     Defendant is a corporation and, therefore, is a "person" within the meaning of the Sherman Law.

167.     Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of the advertising provisions of the Sherman Law (Article 3) and the misbranded food provisions of the Sherman Law (Article 6).

168.     Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

169.     Defendant's business practices are unlawful under § 17200, *et seq.* by virtue of Defendant's violations of the Consumers Legal Remedies Act, Cal. Civ. Code. § 1750 *et seq.*

170.     Defendant sold Plaintiffs and the Class Misbranded Food Products that were not capable of being sold or held legally and which were legally worthless and had no economic value. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

171.     As a result of Defendant's illegal business practices, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and to restore to any Class Member any money paid for the Misbranded Food Products.

172.     Defendant's unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiffs and the Class.

173.     As a result of Defendant's conduct, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

### SECOND CAUSE OF ACTION
**Business and Professions Code § 17200, *et seq.***
**Unfair Business Acts and Practices**

174.     Plaintiffs incorporate by reference each allegation set forth above.

175.     Defendant's conduct as set forth herein constitutes unfair business acts and practices.

176.     Defendant sold Misbranded Food Products in California during the Class Period.

177.     Plaintiffs and members of the Class suffered substantial injuries by virtue of buying Defendant's Misbranded Food Products that they would not have purchased absent Defendant's illegal conduct as set forth herein.

178.     Defendant's deceptive marketing, advertising, packaging, and labeling of its Misbranded Food Products and its sale of unsalable Misbranded Food Products that were illegal to possess was of no benefit to consumers, and the harm to consumers and competition is substantial.

179.     Defendant sold Plaintiffs and the Class Misbranded Food Products that were not capable of being legally sold or held and that were legally worthless and had no economic value. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

180.     Plaintiffs and the Class who purchased Defendant's Misbranded Food Products had no way of reasonably knowing that the products were misbranded and were not properly marketed, advertised, packaged, and labeled, and thus could not have reasonably avoided the injury each of them suffered.

181.     The consequences of Defendant's conduct as set forth herein outweigh any justification, motive, or reason therefor.  Defendant's conduct is and continues to be illegal and contrary to public policy as well as immoral, unethical and unscrupulous, and is substantially injurious to Plaintiffs and the Class.

182.     As a result of Defendant's conduct, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

### THIRD CAUSE OF ACTION
#### Business and Professions Code § 17200, *et seq.*
#### Fraudulent Business Acts and Practices

183.     Plaintiffs incorporate by reference each allegation set forth above.

184.     Defendant's conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200, *et seq.*

185.     Defendant sold Misbranded Food Products in California during the Class Period.

186.     Defendant's misleading marketing, advertising, packaging, and labeling of the Misbranded Food Products and misrepresentation that the products were salable, capable of legal possession, and not misbranded were likely to deceive reasonable consumers, and in fact, Plaintiffs

and members of the Class were deceived.  Defendant has engaged in fraudulent business acts and practices.

187.     Defendant's fraud and deception caused Plaintiffs and the Class to purchase Defendant's Misbranded Food Products that they would otherwise not have purchased had they known the true nature of those products.

188.     Defendant sold Plaintiffs and the Class Misbranded Food Products that were not capable of being sold or held legally and that were legally worthless and had no economic value. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

189.     As a result of Defendant's conduct as set forth herein, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

## FOURTH CAUSE OF ACTION
### Business and Professions Code § 17500, *et seq.*
### <u>Misleading and Deceptive Advertising</u>

190.     Plaintiffs incorporate by reference each allegation set forth above.

191.     Plaintiffs assert this cause of action for violations of California Business and Professions Code § 17500, *et seq.* for misleading and deceptive advertising against Defendant.

192.     Defendant sold Misbranded Food Products in California during the Class Period.

193.     Defendant engaged in a scheme of offering Misbranded Food Products for sale to Plaintiffs and members of the Class by way of, *inter alia*, product packaging and labeling, and other promotional materials.  These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products.  Defendant's advertisements and inducements were made within California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that such product packaging and labeling, and promotional

materials were intended as inducements to purchase Defendant's Misbranded Food Products and are statements disseminated by Defendant to Plaintiffs and the Class that were intended to reach members of the Class. Defendant knew that these statements were misleading and deceptive as set forth herein.

194.    In furtherance of its plan and scheme, Defendant prepared and distributed within California and nationwide via product packaging and labeling, and other promotional materials, statements that misleadingly and deceptively represented the ingredients contained in, and the nature of, Defendant's Misbranded Food Products. Plaintiffs and the Class necessarily and reasonably relied on Defendant's materials, and were the intended targets of such representations.

195.    Defendant's conduct in disseminating misleading and deceptive statements in California and nationwide to Plaintiffs and the Class was and is likely to deceive reasonable consumers by obfuscating the true ingredients and nature of Defendant's Misbranded Food Products in violation of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*

196.    As a result of Defendant's violations of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiffs and the Class. Misbranded products cannot be legally sold or held and have no economic value and are legally worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

197.    Plaintiffs and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

## FIFTH CAUSE OF ACTION
### Business and Professions Code § 17500, *et seq.*
#### Untrue Advertising

198.    Plaintiffs incorporate by reference each allegation set forth above.

-44-

199.     Plaintiffs assert this cause of action against Defendant for violations of California Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

200.     Defendant sold Misbranded Food Products in California during the Class Period.

201.     Defendant engaged in a scheme of offering Misbranded Food Products for sale to Plaintiffs and the Class by way of product packaging and labeling, and other promotional materials. These materials misrepresented and/or omitted the true contents and nature of Defendant's Misbranded Food Products. Defendant's advertisements and inducements were made in California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that the product packaging and labeling, and promotional materials were intended as inducements to purchase Defendant's Misbranded Food Products, and are statements disseminated by Defendant to Plaintiffs and the Class. Defendant knew that these statements were untrue.

202.     In furtherance of its plan and scheme, Defendant prepared and distributed in California and nationwide via product packaging and labeling, and other promotional materials, statements that falsely advertise the ingredients contained in Defendant's Misbranded Food Products, and falsely misrepresented the nature of those products. Plaintiffs and the Class were the intended targets of such representations and would reasonably be deceived by Defendant's materials.

203.     Defendant's conduct in disseminating untrue advertising throughout California and nationwide deceived Plaintiffs and members of the Class by obfuscating the contents, nature, and quality of Defendant's Misbranded Food Products in violation of the "untrue prong" of California Business and Professions Code § 17500.

204.     As a result of Defendant's violations of the "untrue prong" of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiffs and the Class. Misbranded products cannot be legally sold or held and have no economic value and are legally worthless. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

205.    Plaintiffs and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendant, and such other orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore any money paid for Defendant's Misbranded Food Products by Plaintiffs and the Class.

## SIXTH CAUSE OF ACTION
### Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*

206.    Plaintiffs incorporate by reference each allegation set forth above.

207.    This cause of action is brought pursuant to the CLRA.  This cause of action does not currently seek monetary relief and is limited solely to injunctive relief.  Plaintiffs intends to amend this Complaint to seek monetary relief in accordance with the CLRA after providing Defendant with notice pursuant to Cal. Civ. Code § 1782.

208.    At the time of any amendment seeking damages under the CLRA, Plaintiffs will demonstrate that the violations of the CLRA by Defendant were willful, oppressive, and fraudulent, thus supporting an award of punitive damages.

209.    Consequently, Plaintiffs and the Class will be entitled to actual and punitive damages against Defendant for its violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiffs and the Class will be entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiffs and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

210.    Defendant's actions, representations, and conduct have violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

211.    Defendant sold Misbranded Food Products in California during the Class Period.

212.    Plaintiffs and members of the Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code §1761(d).

213.    Defendant's Misbranded Food Products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

214.     By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(5), of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that it misrepresents the particular ingredients, characteristics, uses, benefits, and quantities of the goods.

215.     By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(7) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that it misrepresents the particular standard, quality, or grade of the goods.

216.     By engaging in the conduct set forth herein, Defendant violated and continues to violate Section 1770(a)(9) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that it advertises goods with the intent not to sell the goods as advertised.

217.     By engaging in the conduct set forth herein, Defendant has violated and continues to violate Section 1770(a)(16) of the CLRA, because Defendant's conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that it represents that a subject of a transaction has been supplied in accordance with a previous representation when it has not.

218.     Plaintiffs request that the Court enjoin Defendant from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2).  If Defendant is not restrained from engaging in these practices in the future, Plaintiffs and the Class will continue to suffer harm.

## SEVENTH CAUSE OF ACTION
### Restitution Based on Unjust Enrichment/Quasi-Contract

219.     Plaintiffs incorporate by reference each allegation set forth above.

220.     As a result of Defendant's unlawful, fraudulent, and misleading labeling, advertising, marketing, and sales of Defendant's Misbranded Food Products, Defendant was enriched at the expense of Plaintiffs and the Class.

221.    Defendant sold Misbranded Food Products to Plaintiffs and the Class that were not capable of being sold or held legally and which were legally worthless and had no economic value. Plaintiffs and the Class paid a premium price for the Misbranded Food Products.

222.    It would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits they received from Plaintiffs and the Class, in light of the fact that the products were not what Defendant purported them to be.  Thus, it would be unjust and inequitable for Defendant to retain the benefit without restitution to Plaintiffs and the Class of all monies paid to Defendant for the products at issue.

223.    As a direct and proximate result of Defendant's actions, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury of their claims.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, and on behalf of the general public, pray for judgment against Defendant as follows:

A.    For an order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.    For an order awarding, as appropriate, damages, restitution or disgorgement to Plaintiffs and the Class for all causes of action other than the CLRA, as Plaintiffs do not seek monetary relief under the CLRA at this time, but may amend their Complaint to seek such relief;

C.    For an order requiring Defendant to immediately cease and desist from selling its Misbranded Food Products in violation of law; enjoining Defendant from continuing to manufacture, label, market, advertise, distribute, and sell these products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

D.    For all equitable remedies available pursuant to Cal. Civ. Code § 1780;

E.    For an order awarding attorneys' fees and costs;

F.    For an order awarding punitive damages;

-48-

1

G.    For an order awarding pre-and post-judgment interest; and

2

H.    For an order providing such further relief as this Court deems proper.

3

4

Dated:  December 20, 2012

5

Respectfully submitted,

6

7

By:_____

8

Ben F. Pierce Gore (SBN 128515)

9

PRATT & ASSOCIATES
1871 The Alameda, Suite 425

10

San Jose, CA  95126
Telephone:  (408) 429-6506

11

Fax:  (408) 369-0752
pgore@prattattorneys.com

12

*Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Class Action Complaint*