RICK L. SHACKELFORD (SBN 151262)
ADAM SIEGLER (SBN 116233)
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California  90067-2121
Tel:        (310) 586-7700; Fax: (310) 586-7800
E-mail:    *ShackelfordR@gtlaw.com*
              *SieglerA@gtlaw.com*

Attorneys for Defendant
Welch Foods, Inc., A Cooperative

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ELIZABETH PARK and CAROLYN OTTO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> WELCH FOODS, INC., A COOPERATIVE, <br><br> Defendant. | Case No. CV12-06449-PSG <br><br> **Assigned to:  Hon. Paul Singh Grewal, U.S. Magistrate** <br><br> **DEFENDANT WELCH FOODS, INC., A COOPERATIVE'S OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASS** <br><br> Hearing Date:   August 18, 2015 <br> Time:             10:00 a.m. <br> Judge:           Hon. Paul S. Grewal <br><br> Complaint Filed:  December 20, 2012 <br> Trial Date:        None Set |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.   FACTUAL BACKGROUND ON PRODUCTS AND PLAINTIFFS ......................... 3

III.   ARGUMENT ............................................................................................... 3

   A.   There Is No Ascertainable Class. ...................................................... 4

       1.   Plaintiffs Cannot Prove Their Own Purchases.......................... 5

       2.   Plaintiffs Cannot Ascertain Which Products Class Members Purchased. .............. 7

   B.   Park and Otto Are Not Typical Or Adequate Representatives Of The Putative Class ............................................................................................ 9

       1.   Park and Otto Are Not Typical ............................................... 9

       2.   Plaintiffs Are Not Adequate Class Representatives.................. 11

       3.   Plaintiffs Have Failed To Prove That Common Issues Predominate. ................... 13

   C.   Materiality Cannot Be Shown By Collective Evidence....................... 14

   D.   Plaintiffs Have No Remedy That Can Be Shown By Collective Evidence..................... 16

       1.   Dr. Capps' Model of "Hedonic" Damages. ............................. 16

       2.   Plaintiffs' Proposed Equitable Remedies Are Unworkable.......... 18

           a.   Plaintiffs' Theory of Restitution Is Not Legally or Factually Viable. ....................... 18

           b.   Plaintiffs' Approach to Disgorgement is Meritless. .............. 20

           c.   Plaintiffs' Full Purchase Price Refund Is Unavailable. ............ 21

           d.   Plaintiffs' Claim for Injunctive Relief is Moot....................... 22

   E.   A Class Action Is Not Superior – Consumers Can Call Welch's Customer Service. ........................................................................................ 22

IV.   CONCLUSION............................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Abbott Labs. Narvin Anti-Trust Litig.,* Case No. C04-1511, 2007 WL 1689899 (N.D. Cal.
    June 11, 2007)..................................................................................................................... 21

*Anderson v. Hain Celestial Grp., Inc.,*
    5:14-CV-03895-EJD, 2015 U.S. Dist. LEXIS 46708 (N.D. Cal. Apr. 8, 2015)................................ 22

*In re Aqua Dots Prods. Liab. Litig.,*
    654 F.3d (7th Cir. 2011) ................................................................................................. 13, 24

*Badella v. Deniro Mktg. LLC,*
    No. C 10–03908 CRB, 2011 WL 5358400 (N.D. Cal. Nov. 4, 2011)............................... 13

*Bronson v. Johnson & Johnson, Inc.,*
    No. C 12-04184 CRB, 2013 WL 1629191 (N.D. Cal. Apr. 16, 2013) ........................... 22

*Carrera v. Bayer Corp.,*
    727 F.3d 300 (3d Cir. 2013)........................................................................... 4, 5, 8, 9

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426, 185 L.Ed.2d 515 (2013) ............................................................... *passim*

*Cruz v. Dollar Tree Stores, Inc.,*
    Nos. 07–2050 SC, 07–4012 SC, 2009 WL 1458032 (May 26, 2009), *modified in part*
    *by* 270 F.R.D. 499 (N.D. Cal. 2010)............................................................................... 13

*In Re Dry Max Pampers Litig.,*
    724 F.3d 713 (6th Cir. 2013) .................................................................................. 23, 24

*Eisen v. Carlisle & Jacquelin,*
    479 F.2d 1005 (2d Cir. 1973), *vacated on other grounds,* 417 U.S. 156 (1974)............................... 19

*Ellsworth v. U.S. Bank, N.A.,*
    Case No. C-12-02506 LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014)........................................ 21

*Eubank v. Pella Corp.,*
    753 F.3d 718 (7th Cir. 2014) ....................................................................................... 12

*Feske v. MHC Thousand Trails Ltd. P'ship,*
    No. 11-4124 PSG, 2013 WL 1120816 (N.D. Cal. Mar. 18, 2013) .............................. 4, 11

*Foster Poultry Farms v. Sun Trust Bank,*
    Case No. 1:04-CV-5513, 2008 WL 1970823 (C.D. Cal. May 5, 2008), *aff'd in part,*
    *rev'd in part by* 377 F. App'x 665 (9th Cir. Apr. 26, 2010)........................................ 19, 20

*Hodes v. Van's Int'l. Foods,*
  CV 09-01530 RGK (FFMx), 2009 WL 2424214 (C.D. Cal. July 23, 2009) ................................... 8

*Howard v. Gap, Inc.,*
  No. C 06-06773 WHA, 2009 WL 3571984 (N.D. Cal. Oct. 29, 2009) ............................... 14

*Johnson v. Harley-Davidson Motor Co.,*
  285 F.R.D. 573 (E.D. Cal. 2012) ............................................................................................. 13

*Karhu v. Vital Pharmaceuticals, Inc.,*
  No. 14-11648, 2015 WL 3560722 (11th Cir. June 9, 2015) .......................................... 7, 8

*Kearns v. Ford Motor Co.,*
  567 F.3d 1120 (9th Cir. 2009) ........................................................................................ 13, 14

*Keilholtz v. Lennox Health Prods., Inc.,*
  268 F.R.D. 330 (N.D. Cal. 2010) ................................................................................................ 21

*Langendorf v. Skinnygirl Cocktails, LLC,*
  ___ F.R.D. ___, 214 WL 5487670, (N.D. Ill. 2014) .......................................................... 12

*Mahfood v. QVC, Inc.,*
  No. SACV 06-0659-AG(ANx), 2008 WL 5381088 (C.D. Cal. Sept. 22, 2008) ..................... 14

*Major v. Ocean Spray,*
  5:12-CV-03067-EJD (N.D. Cal. Feb. 26, 2015) .......................................................................... 1

*Marcus v. BMW of N. Am., LLC,*
  687 F.3d 583 (3d Cir. 2012) ........................................................................................................ 4

*Martin v. Pac. Parking Sys., Inc.,*
  583 F. App'x. 803 (9th Cir. 2014), *cert. denied,* 135 S. Ct. 962 (2015) ............................... 5

*Mazza v. Am. Honda Motor Co.,*
  666 F.3d 581 (9th Cir. 2012) ................................................................................................ 4, 14

*McCrary v. Elations Co., LLC,*
  No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443 (C.D. Cal., Jan 13,
  2014) ............................................................................................................................................ 18

*McLaughlin v. Am. Tobacco Co.,*
  522 F.3d 215 (2d Cir. 2008) ................................................................................................ 15, 19

*In re POM Wonderful LLC,*
  No. ML 10-02199 DDP, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ................................. 8

*Schwartz v. Upper Deck Co.,*
  183 F.R.D. 672 (S.D. Cal. 1999) ................................................................................................. 4

*Sethavanish v. ZonePerfect Nutrition Co.,*
  No. 12-2907-SC, 2014 WL 580696 (N.D. Cal. Feb. 13, 2014) ............................................... 8

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ................................................................................ 13

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................................................ 14

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ............................................................................................. 4

*Waller v. Hewlett-Packard Co.*,
   No. 11 cv0454 LAB, 2013 WL 5551642 (S.D. Cal. Sept. 29, 2013) ..................... 24

*Webb v. Carter's, Inc.*,
   272 F.R.D. 489 (C.D. Cal. 2011) ........................................................................... 24

*Werdebaugh v. Blue Diamond Growers*,
   Case No. 12-cv-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ........ 17

*Xavier v. Philip Morris USA Inc.*,
   787 F. Supp. 2d 1075 (N.D. Cal. 2011) .............................................................. 4, 5

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ................................................................................. 4

**State Cases**

*Ajaxo, Inc. v. E*Trade Fin. Corp.*,
   187 Cal. App. 4th 1295 (2010) .............................................................................. 21

*Caro v. Procter & Gamble Co.*,
   18 Cal. App. 4th 644 (1993) ............................................................................. 24, 25

*Colgan v. Leatherman*,
   135 Cal. App. 4th 663 (2006) ................................................................................ 16

*County of San Bernardino v. Walsh*,
   158 Cal. App. 4th 533 (2008) ................................................................................ 20

*Korea Supply v. Lockhead Martin Corp.*,
   29 Cal. 4th 1134 (2003) ......................................................................................... 22

*Meister v. Mensinger*,
   230 Cal. App. 4th 381 (2014) ........................................................................... 20, 21

*In re Steroid Hormone Product Cases*,
   181 Cal. App. 4th 145 (2010) ................................................................................ 22

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ..................................................................................... 14, 16

*In re Vioxx Class Cases*,
    180 Cal. App. 4th 116 (2010) ........................................................................... 21

**Rules**

Federal Rules of Civil Procedure, Rule 9(b) ........................................................ 13

Federal Rules of Civil Procedure, Rule 23 .................................................. 3, 4, 20

Federal Rules of Civil Procedure, Rule 23(a) ...................................................... 4

Federal Rules of Civil Procedure, Rule 23(a)(4) ................................................ 24

Federal Rules of Civil Procedure, Rule 23(b) ...................................................... 4

Federal Rules of Civil Procedure, Rule 23(b)(3) ........................................... 4, 13

**Other Authorities**

Restatement (Third) of Restitution, § 51(4) (2011) ............................................ 19

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether the proposed class of anonymous retail purchasers of Welch's 100% Juice and Welch's All Natural Spreads, who cannot be identified by any information in Welch's possession, is ascertainable, as required by Fed. R. Civ. P Rule 23.

2.      Whether the proposed class satisfies the requirements of Fed. R. Civ. P. 23(b)(2).

3.      Whether the proposed class satisfies the requirements of Fed. R. Civ. P. 23(b)(3), and, in particular, whether plaintiffs have identified a remedy that can meet the requirements of *Comcast Corp. v. Behrens*, 133 S. Ct. 1426 (2013).

## I.   **INTRODUCTION AND SUMMARY OF ARGUMENT**

This food labeling case is based on claims that two named Plaintiffs, Park and Otto, were harmed by their retail purchases of allegedly misbranded Welch's 100% Juice products and Welch's All Natural Strawberry Spread.  They seek this Court's approval to represent thousands of other anonymous and unidentifiable consumers they contend were similarly harmed.  However, ***only Park and Otto*** have received the tutorial on the alleged "evils" of misbranding dispensed by Plaintiffs' counsel.  Members of the public have no idea they have been "harmed."

This is one in a series of cases in which the same group of attorneys have pursued various theories of misbranding against food labels.  Whatever the merits of those other cases, the claims here all fail on the merits.  Accordingly, Welch's has concurrently filed a summary judgment motion that demonstrates the deficiencies in plaintiffs' claims.  Welch's respectfully asks the Court to consider and grant the summary judgment motion and deny Plaintiffs' class certification as moot, just as Judge Davila recently did in a very similar case, *Major v. Ocean Spray*, 5:12-CV-03067-EJD, which involved similar allegations.

Specifically, Plaintiffs claim, as did the plaintiff in *Major*, that the 100% Juice products are ineligible to carry the "No Sugar Added" statement because they contain fruit juice concentrate.  Plaintiffs try to distance themselves from *Major* by arguing that they thought Welch's 100% Juice products were low in calories or sugar because there was no disclaimer telling them the juice was "not a low calorie food" and directing them to look at the nutrition facts panel.  In so doing, they have staked themselves to an implausible story.  Reasonable consumers already know to look at the nutrition facts panel for information on calories and sugar.  Thus, if plaintiffs here differ from *Major*, it is only in the sense that they were "unreasonable," and their claims rest upon highly idiosyncratic beliefs and behavior.  Moreover, the disclaimer has since been added to the label, with no change in the price or demand for the product, and Plaintiffs suffered no injury or loss as a result of its presence or absence.  Separately, Plaintiff Otto – but not her co-plaintiff Park –claims that she was injured because the All Natural Spread contains "citric acid," which she thinks is unnatural and potentially harmful.   However, citric acid occurs naturally in all fruits and consumers would reasonably expect to see it in fruit preserves.  Welch's ingredient came from a reputable supplier using a natural fermentation process.

Although the Court need not reach the class certification motion if it grants summary judgment, there are substantial independent grounds for denying class certification.  First and foremost, the class is **not ascertainable**.  Plaintiffs have not identified any reliable basis for identifying absentee class members.  Welch's sells only to wholesalers and has no records of who purchases at retail.  The sales data Plaintiffs' experts propose to use do not identify individual consumers.  Plaintiffs' proposed class consists entirely of "say so" consumers – people, like Plaintiffs, with no receipts or proof of purchase, who want something for free based on their "say so" that they bought the products and were misled.  Courts have repeatedly declined to certify similar "say-so" classes on grounds of ascertainability.

Plaintiffs are **not typical** and are **not adequate class representatives**.  Ms. Otto **says** she **avoids sugar** and won't buy products with citric acid – but in the years since she filed this action, she purchased sugar-laden candy bars, marshmallows, breakfast syrup and multiple products with citric acid.  She also testified that she thought the Welch's 100% Grape juice had ***no*** sugar – a ridiculous assertion that cannot be shared by any rational consumer, and which is belied by the very label she says she relied upon.  Ms. Park claims she bought Welch's 100% grape juice products 200 times, and thought they were ***low*** in sugar.  But in her 200 purchases, she claims she never once noticed the nutrition facts panel, which told her that it had 140 calories per serving.  She claims she stopped buying Welch's 100% Juice once she had consulted with counsel, but she replaced it with a pomegranate juice which has 150 calories per serving.  Both Plaintiffs were recruited into the case through the introduction by a mutual friend, an attorney who is also Otto's employer.  Aside from their less than arms' length association with counsel, these plaintiffs have little in common with one another and even less in common with the class they seek to represent.

**Common Issues Do Not Predominate**.  Each class member's purchasing experience presents myriad individual issues.  Every purchaser confronted a different set of available products and possible alternatives to the Welch's products they chose.  The prices consumers paid varied widely as did the factors each purchaser considered in reaching the purchasing decision.  What purchasers actually bought also varied, as did the quantities purchased, and in some cases, even the labels themselves were different.  Any questions of fact or law common to the proposed class are overwhelmed by the individual circumstances of each purchaser and purchase transaction.

2

Plaintiffs' claim of **materiality cannot be shown by collective evidence**.  The technical labeling violations alleged by Plaintiffs were not material to consumers, and did not cause any "harm" to anyone. Plaintiffs and their experts have offered no evidence or consumer research to support their speculation that such technical labeling issues were material to real world consumers or that the absence of the disclaimer had any effect on retail prices.  In fact, when the "not a low calorie food" disclaimer was added in 2013, there was no decrease in price in volume.

Plaintiffs' **damages and restitution theories are not valid or reliable**.  Plaintiffs' expert, Dr. Capps, cannot account for all of the individual aspects of purchasing decisions, including price, sales, brand equity, and even taste.  Just saying that he can "control for that" is not the same as actually doing the scientific analysis, which he hasn't done and cannot do with the data he proposes to use.  Plaintiffs' consumer expert, Dr. Caswell, has admitted she never did the hard work that would actually be required to support her speculative assertions about consumer behavior, and plaintiffs' third expert, Dr. Scarbrough, has actually admitted that the "No Sugar Added" labels are "literally true."

In a desperate bit of candor, Plaintiffs ask this Court to ignore precedent and due process and simply make up some "nominal damages" and then award the attorneys a hefty fee for their efforts.

A class action is **not a superior remedy** for addressing the "harm" Plaintiffs feel they have suffered.  Welch's has a customer service center with a toll free number, with a friendly staff who can promptly address any complaints or requests for refunds.  Plaintiffs never even bothered to call.

No matter how the case is sliced, the result is the same:  Plaintiffs are not reasonable, representative consumers.  They are not re-sellers.  They fully consumed the products without injury, they suffered no economic loss, and they were never prosecuted for holding "illegal" fruit juice and Strawberry Spread.  Welch's respectfully asks the Court not to allow this made-up case to proceed any further, and to grant the summary judgment motion and to deny class certification motion as moot.

## II.   FACTUAL BACKGROUND ON PRODUCTS AND PLAINTIFFS

Welch's respectfully refers to and incorporates the facts in its summary judgment motion.

## III.   ARGUMENT

Plaintiffs must affirmatively demonstrate that the proposed class meets the requirements of Federal Rule of Civil Procedure 23, and their showing is subject to a rigorous analysis by the

3

Court. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). "Rule 23(a) requires plaintiffs to show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Feske v. MHC Thousand Trails Ltd. P'ship*, No. 11-4124 PSG, 2013 WL 1120816 at *11 (N.D. Cal. Mar. 18, 2013) (internal quotation marks omitted). "If plaintiffs satisfy the threshold Rule 23(a) requirements, they must also show that the putative class satisfies one of the three forms provided in Rule 23(b)." *Id*. Rule 23(b)(3) also requires Plaintiffs to "demonstrate the superiority of maintaining a class action and show 'that the questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012) (quoting Fed. R. Civ. P. 23(b)(3)).

A.      **There Is No Ascertainable Class.**

Putative class actions involving retail purchases of low cost consumer products create significant problems for courts in establishing appropriate safeguards to answer even the most basic question of how to identify who is, and who is not, in the class. These problems are generally analyzed under the rubric of ascertainability.[1] *See Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 680 (S.D. Cal. 1999) ("[T]he class must be adequately defined and clearly ascertainable before a class action may proceed."); *see also Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) ("Ascertainability is needed for properly enforcing the preclusive effect of final judgment."); *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) ("[A] plaintiff must show, by a preponderance of the evidence, that the class is currently and readily ascertainable based on objective criteria.") (citations & quotation markss omitted); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012) ("Many courts and commentators have recognized that an essential prerequisite of a class action . . . is that the class must be currently and readily ascertainable based on objective criteria.") (collecting cases).

---

[1] Ascertainability is also an integral part of typicality, predominance and manageability. These concepts come from different angles, but all describe a basic point: in order to satisfy Rule 23, one must be able to determine who is a class member in some administratively feasible fashion that does not involve fact-specific mini-trials and does comport with due process rights of defendants and absent class members.

A class definition must satisfy two criteria: (i) the class itself must be <u>clearly defined</u>; and (ii) the class must be <u>objectively ascertainable</u> — *i.e.*, there must be some mechanism for accurately identifying who class members are, apart from their own say-so.  *E.g., Carrera*, 727 F.3d at 305 (3rd Cir. 2013).  Although some district courts have certified classes merely on the basis of an objective definition (*i.e.*, "Did you purchase the product or not?"), the courts of appeal have emphasized that **objective, collective evidence** must show who does and does not meet the class definition, and have ruled out "say-so" clases because they lack such evidence.

A defendant has a due process right to challenge class membership.  *Carrera*, 727 F.3d at 307 ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues.")  This is particularly important in cases going back years, where different labels are involved and there are no purchase receipts.  Ascertainability also serves administrative purposes – *i.e., avoiding individualized factual inquiries* and ensuring that identifying class members is "a manageable process." *Id.* (citing William B. Rubenstein and Alba Conte, *Newberg on Class Actions* § 3.3 (5th ed. 2011), **Ex. 38**).  Demonstrating ascertainability is a necessary showing Plaintiffs must make.  *See, e.g., Martin v. Pac. Parking Sys., Inc.*, 583 F. App'x. 803, 804 (9th Cir. 2014) (Mem. Disp.) (affirming denial of certification where determining individuals in proposed class was not "administratively feasible"), *cert. denied*, 135 S. Ct. 962 (2015); *Carrera,* 727 F.3d at 307-08 ("The method of determining whether someone is in the class must be 'administratively feasible' . . . [which] means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry.").  "Indeed, courts of appeals have found class certification to be inappropriate where ascertaining class membership would require unmanageable individualized inquiry."  *Xavier,* 787 F. Supp. 2d at 1089 (citing *Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 431-33 (6th Cir. 2009)).

### 1.   <u>Plaintiffs Cannot Prove Their Own Purchases.</u>

Plaintiffs exemplify the say-so problem.  They have no receipts, credit card statements, cancelled checks or other documents to show that they ever purchased any Welch's 100% Juice or Natural Spread product, much less (i) where they bought; (ii) how often, and (iii) at what price.  Park produced no

receipts whatsoever in discovery.  Otto produced some grocery receipts, but only for 2013-2014, after the class period and after she had filed suit.  (**Ex. 17;** Otto Depo. 99:13-20, **Ex. 7**; Siegler Decl. ¶ 8.)

Plaintiffs' changing stories prove why Welch's has a due process right to challenge the claims of would-be class members.  In the Second Amended Complaint, Park alleged that she had purchased the Welch's "Light Concord Grape Juice Beverage" and the "Grape Jelly" (which was the basis for her now-abandoned sodium citrate claim).  (SAC ¶¶ 27, **Dkt. No. 12**.)   In her deposition, Park confirmed that ¶ 27 accurately described what she had bought and that "the products, here, that are listed of the grape juice, **absolutely I purchased them** . . . ."  (Park Depo. 55:22-25, **Ex. 6**.)  Then, after conferring with her counsel, Park changed her story and said she never bought the Light Grape Juice or the Grape Jelly.  (Park Depo. 126:19-127:4.)  But it took a deposition to get the truth.

These are not just credibility issues.  Whether a person bought the right product, or a product with the right label, is the most basic issue.  There must be an administratively feasible way of addressing that issue, or else the class cannot be certified.  Otherwise, not only are Welch's due process rights affected, so are those of other class members, whose claims might be diluted or even defeated by including persons who actually had no valid claim.  Plaintiffs' motion does not even address this requirement.  But Park asserts that she should receive $600 for <u>200</u> Juice purchases over 4 years, without a single receipt, and that every class member should be able to do the same.

Otto had an even harder time with her lines in testifying about the Natural Spreads.  She sued claiming that the Strawberry, Grape and Raspberry Natural Spreads are part of a product line that contained citric acid and sodium citrate.  (TAC ¶ 14, **Dkt. No. 36**.)  In her Motion, she repeats this claim that the products contain "chemicals of sodium citrate and citric acid."  (Plaintiffs' Mot. at 2.)  But the Spreads are not all the same:  the Strawberry and Raspberry Spreads have added citric acid, but only the Grape Spread has sodium citrate.  But Otto didn't buy the Grape Spread – she bought the Strawberry Spread.  (TAC ¶ 14.)   She suddenly realized this when showed the Strawberry Spread bottle:

> Q.    Okay.  Can you show us where on the label it says sodium citrate?
> A.    Here is citric acid.  I don't see it on the label.
> Q.    Do you claim that Welch's Natural Strawberry Spread has **sodium citrate in it**?
> A.    I don't know.  **It's not on this label**.  **It doesn't** --

(Otto Depo. 111:6-14).

After suing on sodium citrate, it turns out Otto **never bought the product which contained it**:

MR. GORE:  **We will stipulate that the label does not identify sodium citrate as an ingredient**, and Miss Otto's claims with respect to this product are **not based on the presence of sodium citrate** but, rather, citric acid, which is I think what you want.

(Otto Depo. 112:1-14, emphasis added.)

Plaintiffs undoubtedly have this same problem in common with absentee class members:  they have nothing but dim memories to establish the facts to support their claims.

## 2.     Plaintiffs Cannot Ascertain Which Products Class Members Purchased.

The unsupported say-so of would-be class members seeking some financial benefit does not fit the requirement of objective, collective evidence.  The Eleventh Circuit recently upheld a district court's denial of certification for precisely these reasons.  In *Karhu v. Vital Pharmaceuticals, Inc.*, No. 14-11648, 2015 WL 3560722 (11th Cir. June 9, 2015), plaintiffs sued the manufacturer of a weight loss supplement.  They proposed to identify class members from defendant's "sales data."  The district court noted that the defendant's data – detailing sales to retailers and distributors – could not possibly be used to identify individual class members who purchased the product at retail.  The district court also rejected the notion that plaintiffs should be permitted to self-identify.  *Id.* at *3-4.

The Eleventh Circuit agreed that neither proposed method of identifying class members was administratively feasible.  First, data reflecting sales to distributors and retailers was unhelpful: "[a] plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for *identification purposes*, and that identification will be *administratively feasible*." *Id.* at *3 (emphasis added).   Second, the Court rejected self-identification.   The Court reviewed various cases and determined that that such an approach (1) is likely to be unreliable[2] and (2) raises due process issues

---

[2] The concurring opinion in *Karhu* also notes that, aside from the usual concerns about uncorroborated and potentially false claims, potential class members in many cases will be unable to remember their purchases or accurately identify themselves.  In particular, "[w]here a challenged product is similar to other unchallenged products on the market, consumers may find it hard to know whether they purchased the challenged product."  *Id.* at *7 (citing *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *10 (N.D. Cal. June 13, 2014) (noting a "subjective memory problem" because "there were literally dozens of varieties with different can sizes, ingredients, and labeling over time and some Hunt's cans included the challenged language, while others included no such language at all.")).  Forget "dozens" –  in the San Francisco/Oakland Market alone, for the period between 2013 and 2014, there were **well over 100 types of 100% juices coded as "no sugar added" being sold**.  (Ross Decl. ¶ 14.)

7

that, absent "case-specific and demonstrably reliable" screening methods, are fatal to ascertainability. *Id.* at \*3-5. The lack of an ascertainable class, in turn, was fatal to certification. *Id.* at \*5.

This case has the same problem. There must be some objective data to verify actual purchases, because that is the key to class membership. There must be some verifiable proof of quantities bought and prices paid, because those facts are the basis of Plaintiffs' proposed remedies. Plaintiffs can't rely on Welch's data; Welch's sells primarily to distributors and wholesalers, and therefore has no record of who bought at retail. *See Karhu*, 2015 WL 3560722, at \*3 ("A plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records[.]") Welch's has no way to connect these dots, and Plaintiffs have not identified any place they would go to find it. Instead, they imply that because "[o]nly those consumers who purchased Defendant's products whose labels bore the challenged statements are included[,]" the class definition is "sufficiently definite" to identify members. (Class Cert. Mot. at 4:17-20, **Dkt. No. 37**.) This merely begs the question of what evidence will be used to distinguish between who purchased and who did not, and it does not speak to administrative feasibility at all. *See Carrera*, 727 F.3d at 306 ("A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful."). This shortcoming is fatal to the class certification motion. As the court held in *Sethavanish v. ZonePerfect Nutrition Co.*, No. 12-2907-SC, 2014 WL 580696, at \*6 (N.D. Cal. Feb. 13, 2014):

> Plaintiff has yet to present any method for determining class membership, let alone an administratively feasible method. It is unclear how Plaintiff intends to determine **who purchased** ZonePerfect bars during the proposed class period, **or how many** ZonePerfect bars each of these putative class members purchased. It is also unclear how Plaintiff intends to weed out **inaccurate or fraudulent claims**. Without more, the Court cannot find that the proposed class is ascertainable.

*See also In re POM Wonderful LLC*, No. ML 10-02199 DDP (RZx), 2014 WL 1225184, at \*6 (C.D. Cal. Mar. 25, 2014) (class of retail juice purchasers was not ascertainable); *Hodes v. Van's Int'l. Foods*, CV 09-01530 RGK (FFMx), 2009 WL 2424214, at \*4 (C.D. Cal. July 23, 2009) (denying certification where "the Court has concerns about how Plaintiffs will identify each class member and prove which brand of Van's frozen waffles each member purchased, in what quantity, and for what purpose").

Even with the aid of counsel, Plaintiffs' recollections of their own purchases are moving targets. As the Third Circuit noted in *Carrera*, verifiable objective proof that a plaintiff purchased the product at issue during the relevant time period is an essential element of a named plaintiff's individual claim. Thus, "a defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues."  727 F.3d at 307.  Welch's has a due process right to challenge the evidence on every one of those points, and that right is not vitiated just because Plaintiffs here seek to proceed as a class action.

**B.**   **Park and Otto Are Not Typical Or Adequate Representatives Of The Putative Class**

Even if a class could be ascertained, Park and Otto are the wrong people to represent it.

**1.**   **Park and Otto Are Not Typical**

If Park and Otto are typical of the class, it is a very strange class indeed.  In fact, Park and Otto are not even typical of each other.  To give just a few examples, Otto says she read the label and believed that the 100% Juice had <u>no</u> sugar:

> Q.   Did you know when you purchased the 100 percent grape juice product that it had sugar in it?
> A.   No.  I assumed -- it said "no sugar added," so I **assumed there was no sugar** in there.
> Q.   Do you have any understanding about whether or not fruit juice has sugar in it in its natural state?
> A.   No.  I mean there's natural sugar but I don't know how much.
> Q.   So would it be fair to say then that in 2008 through 2012, you understood that Welch's 100 Percent Grape Juice had some sugar in it; is that right? [Colloquy omitted]
> Q.   Yes, ma'am.  When you purchased the Welch's 100 Percent Grape Juice product, Exhibit 16, did you have an understanding that it **did have some sugar in it?**
> A.   **No.**

(Otto Depo. 70:4-25, emphasis added.)

But Park says she read the <u>same</u> label and believed the 100% juice <u>did</u> have sugar in it:

> Q.   When you were purchasing these juices, including **Exhibit** 16, did you believe that they had **no sugar in them**?
> A.   **No.**
> Q.   Did you believe they had **some sugar in them**?
> A.   **Yes.**

(Park Depo. 60:5-11, emphasis added.)

These two diametrically opposed positions – "No" and "Yes" as to the presence of sugar – cannot simultaneously be typical of the same class.

Park was not deceived or confused about calorie content.  She claims she purchased the 100% Juice 200 times (Park Decl. ¶ 5, **Ex. 4**) and never looked at the label to see how many calories or how much sugar was in the Juice.

> Q.    At any time during the 200 times you bought the 100% Grape Juice during the four years, 2008 to 2012, did you ever look at the nutrition facts label?
> A.    No, I did not, that I recall.  Once I -- once I purchase something, it's purchased.

(Park Depo. 61:24-62:4.)

But even Park concedes that she has no reason to believe that other consumers are so willfully oblivious to the nutrition facts panel:

> Q.    Would you -- do you have any reason to believe that other consumers -- do you have any factual reason to believe that other consumers do not read the nutritional fact panel on products?
> A.    I have no idea.

(Park Depo. 114:22-115:1.)

As for Ms. Otto, she is suing because citric acid and sodium citrate are artificial chemicals that she seeks to avoid:

> A.    Well, I'm suing -- there's -- **there's chemicals in here**.  There's **citric acid** and sodium citrate.

(Otto Depo. 111:3-5, emphasis added.) (She later admitted she didn't buy products with sodium citrate.)

But Park acknowledges that citric acid occurs naturally in fruit:

> Q.    Have you ever heard of something called citric acid in citrus fruits?
> A.    Yes, I have.
> Q.    Do you have any understanding what that is?
> A.    It's a product -- I mean, it's a natural ingredient or composition of lemons, limes, citric acid.  Oranges – I mean oranges.  Right.
> Q.    Thank you.   Do you specifically **avoid foods and beverages which contain citric acid?**
> A.    **No.**

(Park Depo. 98:17-99:2, emphasis added.)

What sets these Plaintiffs apart from all other consumers, however, is their unique, lawyer-driven fixation on technical label issues.  They both have declared under penalty of perjury that they have no

10

complaints with Welch's actual products at all:  not with the taste, the price, the value, the ingredients, or even the amount of sugar they contain.

> I **would purchase** Welch's 100% juices, were each to be labeled properly, so that it was no longer misbranded and was no longer illegal to sell or hold, under California law.

(Park Decl. ¶ 4, Ex. 4, Otto Decl. ¶ 5, Ex. 5, emphasis added.)

In other words, Park and Otto's real complaint is **not** that they were fooled into buying products with too many calories or citric acid – it is that the products were technically misbranded and "illegal to sell or hold."  Once properly labeled, they would apparently be happy to purchase these same products, sugar, citric acid and all.  This absurd, legalistic position is completely at odds with what class members who had been misled by the label would be expected to say, namely that they would <u>not</u> buy the product ever again once they learned that it contained citric acid or 140 calories per serving.   The people who really care about how many calories are in the 100% Juice actually read the nutrition fact panels, and thus could not have been deceived.

### 2.    <u>Plaintiffs Are Not Adequate Class Representatives</u>

Plaintiffs are not appropriate class representatives for additional reasons. **"**Potential class representatives must satisfy primarily two factors to be adequate representatives: (1) that they will vigorously pursue the class claims on behalf of all members; and (2) that they and their counsel have no conflicts with the other members of the class. **But the court may also look to the honesty and candor of the offered representatives.**" *Feske v. MHC Thousand Trails Ltd. P'ship*, No. 11-4124 PSG, 2013 WL 1120816, at *12 (N.D. Cal. Mar. 18, 2013) (footnote omitted).

The second prong raises serious concerns in this case.  Park and Otto are not ordinary consumers who felt aggrieved and went searching for someone to represent them.  Rather, the search went the other way.  They were both recruited by attorney Sharon Pratt, and sent to their current counsel, Mr. Gore, who is of-counsel to Ms. Pratt's law firm and offices in the same suite.  (Gore Counsel Listing, **Ex. 22**.) Since 2010, Otto has worked part-time as a receptionist and clerk at Pratt & Associates.  Ms. Pratt is a personal friend of both Otto and Park.  (Otto Depo. 155:2-156:1; Park Depo 121:16-19.)  Otto testified that Sharon Pratt told her that she had "hired on" or had a "new attorney in her practice," and sent Otto to see Mr. Gore.  Otto further testified that she does clerical work for Mr. Gore.  (Otto Depo. 156:22-24;

159:23-25.)  On February 25, when her deposition was taken, Otto testified that she had been to work at Mr. Gore's office that very same day.  (Otto Depo. 174:16-19.)  Like Ms. Otto, Park was sent to Mr. Gore by Ms. Pratt.  (Park Dep. 121:16-19.)

Worse yet, their "claims" were put into their heads by counsel, not by any actual or even perceived harm they suffered.  Neither of these plaintiffs had any issue with any specific Welch's product until Mr. Gore told them what they were going to sue about.  As Park testified:

> Q.    I believe I had asked you earlier about **when you came to believe that Welch's had added sugar.**  And you had described for me some time in April 2012; is that right?
> A.    Yes.
> Q.    And is that the same moment in time you believe you suddenly realized that Welch's was not a low-calorie beverage?
> A.    Yes.
> Q.    **Where were you** physically when you had these realizations?
> A.    **In the attorney's office, Pratt & Associates.**

(Park Depo. 119:13-25, emphasis added.)

As Park put it, "And so I **didn't know anything really**, other than I consumed this product, and to call Mr. Gore.  And that's when I had my meeting with him." (Park Depo. 122:23-123:1.)

This is obviously no arms' length relationship.  Ms. Otto, in particular, is in a very difficult position because her employer, Ms. Pratt, directed her to see Mr. Gore, who works in the same law office.  She is being put in a position of saying things under oath that are necessary to support the lawsuit, but are inconsistent with her buying experience.

This kind of close relationship has been the reason for denying class certification.  *See Langendorf v. Skinnygirl Cocktails, LLC*, No. 11 CV 7060, 214 WL 5487670, at *4 (N.D. Ill. Oct. 30, 2014) (denying class certification because of close relationship between attorney and plaintiff's family).  The *Langendorf* court relied on *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), which noted that class representatives are fiduciaries to unnamed class members, and undisclosed close relationships "create[] a grave conflict of interest; for the larger the fee award to class counsel, the better off Saltzman's daughter and son-in-law would be financially – and (which sharpened the conflict of interest) by a lot." 753 F.3d at 723-24.  Where, as here, one of the named plaintiffs is employed by a

firm with a financial interest in the case, the failure to disclose it voluntarily should disqualify these Plaintiffs from acting as fiduciaries to the class.

Finally, both of these Plaintiffs testified that they never called the customer service number on the labels. They are not proper representatives for consumers who could have received a prompt remedy by calling Welch's instead of a lawyer. As Judge Easterbrook noted, a plaintiff who overlooks a toll free number and cost-free, make-whole remedy in her haste to call a lawyer is not an adequate person to look after the interests of absentee class members. *See In re Aqua Dots Prods. Liab. Litig.,* 654 F.3d at 752-53 (7th Cir. 2011).

### 3. <u>Plaintiffs Have Failed To Prove That Common Issues Predominate.</u>

Rule 23(b)(3) has two requirements: first, that common issues "predominate" over individual issues; and second, that proceeding as a class action is "superior to other methods for fairly and efficiently adjudicating the controversy." This Court has recognized that 23(b)(3) predominance is "far more demanding" than (a)(3) commonality. *Cruz v. Dollar Tree Stores, Inc.,* Nos. 07–2050 SC, 07–4012 SC, 2009 WL 1458032, at *7 (May 26, 2009), *modified in part by* 270 F.R.D. 499 (N.D. Cal. 2010); *accord Badella v. Deniro Mktg. LLC,* No. C 10–03908 CRB, 2011 WL 5358400, at *6 (N.D. Cal. Nov. 4, 2011). "'Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issue involved,'" *Badella,* 2011 WL 5358400, at *6 (citation omitted), to determine whether the issues raised can be proven on a class-wide basis through generalized evidence or whether individual proof will be needed to establish each class member's entitlement to relief. *See, e.g., Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1024 (9th Cir. 2011) (affirming district court's decision not to certify *Mancini* class because it included consumers who were not misled), *abrogated on other grounds, Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013); *Johnson v. Harley-Davidson Motor Co.,* 285 F.R.D. 573, 583-84 (E.D. Cal. 2012) (where individualized proof needed to resolve multiple issues, including materiality, and only a few would be resolved by generalized proof, predominance not satisfied).

Plaintiffs must show that common issues predominate with respect to the requirements of Rule 9(b) applicable to Plaintiffs' state law claims. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("[W]e have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for

1   violations of the CLRA and UCL."), as well as the circumstances indicating fraudulent conduct, *Vess v.*

2   *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003).  To that end, Plaintiffs must show that

3   common issues predominate with respect to the " ' "**who, what, when, where, and how**" of the

4   misconduct charged," ' " *Kearns*, 567 F.3d at 1124 (emphasis added), as well as the circumstances

5   indicating fraudulent conduct, *Vess*, 317 F.3d at 1106.  These questions are all inherently fact-specific

6   issues that can only be adjudicated on a plaintiff-by-plaintiff basis.  *See Howard v. Gap, Inc.*, No. C 06-

7   06773 WHA, 2009 WL 3571984, at *5 (N.D. Cal. Oct. 29, 2009) (denying class certification because

8   "[t]here is no common method of proof. . . . Each class member would have his or her own individual

9   story to tell.  This goes to liability, not damages.").

10          The highly individualized reasons that Plaintiffs or any other consumer had for purchasing any

11   of the Welch's products at issue, and the unique circumstances attendant to each shopping experience,

12   also contradict any claim of predominance.  *Mahfood v. QVC, Inc.*, No. SACV 06-0659-AG(ANx),

13   2008 WL 5381088, at *5 (C.D. Cal. Sept. 22, 2008) (certification denied due to "variation in individual

14   purchasing experiences").  The essential elements of the claims cannot be shown through collective

15   evidence; therefore, predominance is lacking.

16   **C.     Materiality Cannot Be Shown By Collective Evidence.**

17          Plaintiffs' core legal theory is flawed, because all of the claims require proof that the alleged

18   label infraction had a material impact on retail purchasing decisions.  The same issue can be

19   characterized as reliance, materiality or causation, but under any name, as part of predominance

20   Plaintiffs must show some linkage between the alleged infraction and the purchase decisions of the

21   class.  *See In re Tobacco II Cases,* 46 Cal. 4th 298, 326 (2009) (Plaintiffs must show that

22   misrepresentation was an immediate cause of injury).  It is not enough to show merely an infraction and

23   that units were sold; there has to be something connecting the two, and it must be common to the class

24   in order to satisfy the predominance requirement.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d at 595-96.

25   Plaintiffs' only effort to show materiality or causation is through the declaration of Dr. Caswell.  But her

26   opinions are not supported by any research or evidence.  She has "<u>not</u> seen" data on the 100% Juice and

27   Natural Spread purchases (Caswell Depo. 46:9-17).  Regarding the "No Sugar Added Claim," she has

28   done "<u>no</u> original research," "<u>no</u> consumer surveys," "<u>no</u> market research," "<u>no</u> focus groups," and <u>no</u>

consumer interviews because that is not "part of my research" (*id.* 108:8-109:17), and she hasn't even read any publications about them (*id.* 110:1-8).  She done <u>no</u> work of this type with regard to the Natural Spreads, and she doesn't even know if anybody has.  (*Id.* 118:9-119:1).  She has <u>no</u> opinion about whether consumers paid a premium and indeed <u>no</u> opinion on pricing at all.  (*Id.* 61:6-10; 64:5-12.) And she does <u>no</u> consumer surveys:  "I do <u>not</u> . . . do direct consumer surveys" because that "is <u>not</u> an area that I work in." (*Id.* 40:13-21.)  One thing she does agree on:

> Q.      [I]n making a decision to purchase a product, consumers can weigh a variety of
>          factors, is that right?
> A.      That's right."
> Q.      Such as price, taste, color, and so on? …
> Q.      And different consumers may weigh those factors differently in making their
>          purchasing decision?
> THE WITNESS:  That's correct.

(*Id.* 153:11-24.)

    She has not done that research for Welch's products either.  (*Id.* 154:10-20.)  Thus, when Plaintiffs and their other two experts rely upon Dr. Caswell's mantra that everything on a label is material or manufacturers would not put it here, they are relying on nothing at all.

    The best way to judge whether a label element impacted consumer behavior is to look at pricing and volume before and after the label element was employed.  If the information was material to consumers, then the performance of the product in market would reflect that.  If the challenged label element really created pricing power, the demand curve following a label change would shift.  If the demand curve does not shift as a result of the label change, it is compelling evidence that the alleged label element was immaterial to consumers and had no impact on price.

    This phenomenon was noted in two of the most significant alleged consumer deception cases ever, involving allegedly deceptive advertising of light cigarettes.  In *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), the Second Circuit examined market data following the public disclosure of information to suggest that so-called light cigarettes were no less harmful than full flavor versions.  Nevertheless, the sales data showed that the demand curve never shifted following the disclosures, proving the information was immaterial to consumers.

The trial court in *Tobacco II* in California reached precisely the same result. Although the cigarette advertising had been deceptive, it had not been material to consumers' purchasing decisions, because the demand curve did not shift once the alleged truth about the product was known.  As a result, the class was awarded no monetary recovery.  (**Ex. 37**, Statement of Decision, *In re Tobacco Cases II,* San Diego Superior Court JCCP 4042 (August 15, 2013) at 18).  *See also Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 700 (2006) (reversing restitution award because Plaintiffs provided no evidence of a quantified price difference produced by false label).

Welchs' 100% Juice products are nothing like cigarettes, but the market reaction to the 2014 label change adding the disclaimer language was the same.  It had no impact on wholesale price or overall sales volume, as set forth in the Declaration of Kathryn Mattsson-Boze, the Senior Marketing Manager for Welch's.  (Mattsson-Boze Decl. ¶¶ 4-6; Ross Decl. ¶ 12.)  The reason is obvious: the label change did not tell reasonable consumers anything they did not already know, because ***reasonable consumers never thought the product was reduced calorie in the first place.*** The stable demand curve also shows that omitting the disclaimer did not create retail pricing power.

**D.     Plaintiffs Have No Remedy That Can Be Shown By Collective Evidence.**

Plaintiffs have failed to offer any legally viable remedy.  As the Supreme Court held in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), a class action requires Plaintiffs to identify a theory of recovery available under substantive law and then explain now that remedy can be demonstrated on the basis of collective evidence.  Plaintiffs ignore the many rulings in other "Food Court" cases that have either rejected their damages model because Plaintiffs' experts simply cannot produce a *Comcast*-compliant output by using syndicated sales data.

**1.     Dr. Capps' Model of "Hedonic" Damages.**

Dr. Capps proposes to submit a model of "hedonic" damages that breaks down the retail price for the Welch's products at issue into various attributes, then assigns a portion or percentage of the retail price to the challenged label attributes.  Dr. Capps' model entirely depends upon his ability, in his words, to control "for ***all other factors*** that may influence prices [.]"  (Capps Decl., **Dkt. No. 57-3**, at 9:27 (emphasis supplied).)  He states this cavalierly, as though "all other factors that may influence prices" is a recognized data point that he could confirm through a Google search, or perhaps by

referencing Wikipedia.  But it is not that simple.  To make his model work, Dr. Capps would have to look at many thousands of retail transactions, in hundreds of retailers, for a four year period of time, **just for Welch's products alone.**  He would also have to examine similar data for what he believes to be "comparable" products (which he does not identify), which are determined according to criteria he does not disclose.  Then he must figure out "all other factors that may influence prices" for each of them.

Dr. Capps does not offer any list of what "all other factors that may influence prices" would include, much less any authoritative source for such a list.  He offers no way of testing to be sure he has accounted for "all other factors," much less how he can test and make sure he has "controlled" for them.  He also does not disclose that same these shortcomings have been the death knell in other food court cases.  In *Werdebaugh v. Blue Diamond Growers*, Case No. 12-cv-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014), Judge Koh decertified a damages class based upon just a few of the many shortcomings in Dr. Capps' model in that case:

> Finally, the court is troubled by Dr. Capps' continued failure to ensure the accuracy of his assumptions in developing his damages model.  This is not merely a problem of erroneous data, but is in fact a fundamental flaw with Dr. Capps' methodology.  Dr. Capps asserts that hedonic price regression analysis is able to isolate the value of a particular attribute by "consider[ing] prices of the Defendants' products (with the labeling claim) as well as prices of comparable products (with or without the labeling claim)." . . .  Dr. Capps' application of the hedonic price regression analysis to this particular damages model, however, is highly problematic.  Dr. Capps assumes, without investigating, that all competitor products do not use the labeling claims at issue.  Without knowing whether or not the prices of comparable products are actually affected by the relevant labeling claims, how can the model accurately isolate the value of the labeling claim to Defendant's product?  The flaws with regards to the "brand" and "label" variables and failure to control for the effect of advertising only compound the Court's concern that Dr. Capps' damages model is an ineffective example of a hedonic price regression.  The Court is left with no choice but to conclude that Dr. Capps' model cannot reasonably determine the measure of damages attributable to Defendant's wrongful conduct."

Id. at *13.

In that case, the Court only picked out three factors affecting prices – differences in brands, presence or absence of the challenged label content, and advertising – and concluded that the Capps model did not adequately control for them.   The same criticisms would have to be addressed and overcome for every single "factor that may influence prices" of either Welch's products or the purported "comparable" ones.  Dr. Capps has no answer for these shortcomings.  Indeed, he dismisses Judge

Koh's devastating critique of his model with a footnote reference, which merely acknowledges that the court "found fault with the exclusion or inclusion of certain variables . . . ." (Capps Decl. at 10:27.) Such dismissive comments suggest that Dr. Capps has done nothing to address these flaws.  His declaration does not say how his model has been improved or modified to address the flaws.

The problems are not limited to regression analysis or hedonic damages generally, but rather stem from the syndicated sales data Dr. Capps proposes to use.  As noted in the accompanying declaration of Professor Daniel Apley, the "observational" syndicated sales data cannot yield statistically valid conclusions, because they are uncontrolled, incomplete and were not designed or gathered for such purposes.  They cannot rule out bias, and, due to their inadequacies, cannot be tested for bias.  These data cannot be used to control for all other factors affecting price, because one cannot know what one does not know.  This is true of Dr. Capps or anyone else who might try to use these data for the same purpose.  Anyone in his position only has garbage in, and therefore can only get garbage out.

### 2.   Plaintiffs' Proposed Equitable Remedies Are Unworkable.

#### a.   Plaintiffs' Theory of Restitution Is Not Legally or Factually Viable.

Plaintiffs advocate for a remedy they call "restitutionary disgorgement," which they describe as "the amounts received by Defendant for the sale of misbranded products." (Class Cert. Mot. at 16:21-22.)  According to Plaintiffs, unlike legal damages, this remedy presents no measurement problems, because "the Court need review only the transactions between Defendant and its wholesaler(s)," and "[w]hatever amount Defendant made from those transactions equals the amount of disgorgement." (*Id.* at 16:23-24.)  Plaintiffs further argue that "this measure has ample support in case law," then cite precisely one case. (*Id.* at 16:25-17:1.)

That one case, *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB (OPx), 2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13, 2014), presented claims whether certain dietary supplements in fact were "clinically proven" to have certain joint health benefits as advertised.  The court granted class certification, in part based upon its conclusion that some sort of damages could be proven from documents showing Defendant's net sales, profits and costs.  Contrary to Plaintiffs' arguments here, the *McCrary* court **did not hold** that net wholesale margin was a proper measure of any restitution remedy.

Instead, it was merely a starting point, and would then have to be **reduced by the value plaintiffs actually received**.  The court held that Plaintiffs would not be required to demonstrate at the class certification stage what a "comparable product" was that would serve a proxy for reducing damages.  In reality, the court reserved all of the hard questions of remedies for trial.

A remedy that would purport to divest Welch's of its **entire wholesale profit** violates *Comcast*, which requires the remedy to be **tied to the specific theory of wrongdoing**.  There is no legal justification for such a remedy divorced from allegedly wrongful conduct.  *See, generally* RESTATEMENT (THIRD) OF RESTITUTION, § 51(4) (2011) (unjust enrichment is profit attributable to the underlying wrong).  Unless Plaintiffs could show that Welch's entire wholesale profit was tied directly to the challenged label elements (an opinion Dr. Capps is not prepared to state (Capps Depo., **Ex. 8**, at 79:5-19),  any award that required Welch's to return its entire wholesale profit necessarily would disgorge funds ***completely unrelated to the challenged label claims***.  This theory is also inconsistent with Plaintiffs' operative Third Amended Complaint, which states the theory of harm that they paid "an unwarranted premium for these products" as a result of the challenged label elements.  (TAC ¶ 72.)

Wholesale profits are also not susceptible of being proven by collective evidence.  Plaintiffs' argument would reduce the wholesale profit analysis to a simple math problem.  In reality, however, Welch's net effective wholesale price varies widely over time, and from retailer to retailer after factoring in things like advertising, trade spend and promotional activities.  (Ross Decl. ¶ 16.)  The only way to avoid these individual issues and come up with something that could be shown from collective evidence would be to calculate a lump sum number made up from <u>fabricated</u> average retail and net wholesale prices that do not necessarily reflect the reality of any specific transactions.  This theory of damages is at odds with the theory of injury pled in the Third Amended Complaint (and thus violates *Comcast*), does not tie to any class member's harm (and thus runs afoul of *McLaughlin*), and is an impermissible fluid recovery (which was rejected in *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1006 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156 (1974)).  Accordingly, this theory of remedy is inadequate to support class certification.

Plaintiffs' unique approach to disgorgement finds no support in the cases they cite.  Plaintiffs rely upon *Foster Poultry Farms v. Sun Trust Bank*, Case No. 1:04-CV-5513, 2008 WL 1970823 (C.D.

Cal. May 5, 2008), *aff'd in part, rev'd in part by* 377 F. App'x 665 (9th Cir. Apr. 26, 2010).  That opinion granted "clarification" of a prior, lengthy memorandum opinion following a bench trial involving claims that a bank had misused its customer's confidential financial information to allow the bank to profit in a separate, but related, transaction monetizing debt instruments.  Those facts have nothing to do with Plaintiffs' retail purchase and consumption of delicious juice and spread products.  More to the point, the court observed that **disgorgement divorced from actual harm amounts to a penalty, or exemplary damages**, and is thus "beyond the purpose of awarding unjust enrichment damages." *Id.* at *8.  The court further observed that "disgorgement damages are to deny the unjust profit, **not to punish**." *Id.* (emphasis added).  This case supports the notion that only "profits" tied to the challenged label elements could legitimately be disgorged as "unjust enrichment."  Anything else would be nothing more than a boundless penalty extracted for alleged label infractions.

Plaintiffs' other case is *County of San Bernardino v. Walsh,* 158 Cal. App. 4th 533 (2008).  That case involved public officials who had been criminally convicted for taking bribes, and, in the court's words, "the instant civil action was filed by the County in an effort to recover damages suffered as a result of the bribery." *Id*. at 537.  It has no bearing on the facts of this case and warrants no discussion.

Plaintiffs' plea for "nominal damages" (plus a hefty attorney fee award) is merely the logical last step.  Any award, regardless of label, must be both tied to the alleged wrongdoing and supported by competent evidence that can be adjudicated by collective evidence.  Plaintiffs' various appeals to equity provide nothing for this Court to analyze, whether rigorously or otherwise, and thus cannot form a basis for class certification.  They cite no authority upholding Rule 23 as an appropriate tool for the job.

### b.   Plaintiffs' Approach to Disgorgement is Meritless.

Plaintiffs recognize that their proposed remedies do not satisfy *Comcast*, so they simply abandon trying. They argue instead that "The law in California holds that a plaintiff need not show disgorgement/restitution with mathematical certainty."  (Class Cert. Mot. at 15:5-6.]  Plaintiffs again base their argument upon a solitary, factually inapposite, California case.

In *Meister v. Mensinger*, 230 Cal. App. 4th 381 (2014), the plaintiffs saw their investment of about $2.1 million rendered valueless by the multiple breaches of fiduciary duty and acts of self-dealing by the defendants.  The trial court concluded plaintiffs failed to establish that damages that could be

calculated with certainty, and entered judgment for defendants.  On appeal, the court reversed that judgment, finding that the court had erred in failing to fashion a remedy after trial had proven elaborate wrongdoing by defendants.  The balance of the opinion, including the language Plaintiffs quote, are elaborate dicta, as the *Meister* opinion makes clear:  "To guide the trial court on remand, we provide an overview of the remedies it should consider in reaching a solution."  230 Cal. App. 4th at 396.

*Meister's* dicta do not provide a road map for how to satisfy *Comcast*.  Indeed, the other cases string-cited in Plaintiffs' brief illustrate the point.[3]  In *Ellsworth v. U.S. Bank, N.A.,* Case No. C-12-02506 LB, 2014 WL 2734953 (N.D. Cal. June 13, 2014), the Court certified sub-classes of consumers who had incurred charges and losses due to the defendant's acts of force-placing insurance, after plaintiffs offered the declaration of an expert whose methodology had been accepted by at least two courts in other force-placed insurance cases.  *Id.* at *25.  In contrast, Dr. Capps' methodology has been **rejected** by numerous courts in other food label cases.  In *Keilholtz v. Lennox Health Prods., Inc.*, 268 F.R.D. 330 (N.D. Cal. 2010), decided years before *Comcast*, the court held that labeling the theory of recovery "unjust enrichment," without any discussion of how to prove it, was sufficient to certify a class.  This does not pass muster under *Comcast*.  Finally, in *In re Abbott Labs. Norvir Anti-Trust Litig.*, Nos. C 04-1511 CW, C 04-4303 CW, 2007 WL 1689899 (N.D. Cal. June 11, 2007), the theory of recovery was "whether Defendant unjustly acquired additional revenue or profits by virtue of an anti-competitive premium on the price of *Norvir*."  *Id.* at *9.  The harm was an actual price premium.

### c.     Plaintiffs' Full Purchase Price Refund Is Unavailable.

With other remedies in tatters, Plaintiffs resort to the hypothetical harm of "no resale value." But Plaintiffs fully consumed the products.  They did not try to re-sell them (and did not buy them for that purpose anyway).  On these facts, a full purchase price refund is also unavailable under California law.  The remedy available under the UCL is restitutionary disgorgement, which is measured by the difference between the price paid and the value received.  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2010).  Any difference in value must be demonstrated by competent evidence that shows

---

[3] *Ajaxo, Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295 (2010) was cited, appropriately, by the *Meister* court, because that case involved reversal of a judgment and remand for further proceedings to fashion a remedy in a case where liability for misappropriation of trade secrets had been established.  It provides no guidance as to any model of damages or other relief for this court rigorously to analyze.

some measureable delta.  And contrary to Plaintiffs' appeals to equity, a court has no ability under the UCL to fashion remedies of its own choosing or to "award whatever form of monetary relief it believes might deter unfair practices."  *Korea Supply v. Lockhead Martin Corp.*, 29 Cal. 4th 1134, 1148 (2003).

Again ignoring their own deposition testimony, Plaintiffs argue that neither they nor any reasonable consumer would want to own a misbranded product, citing *In re Steroid Hormone Product Cases,* 181 Cal. App. 4th 145, 159-160 (2010).  This reliance is misplaced.  There is nothing wrong with the Welch's products inside the bottles.  Plaintiffs' claims are based on the label, not the juice or spread. In *Steroid Hormone,* the substance inside the package was the problem, and was illegal to possess regardless what the bottle said.  Plaintiffs have testified that if the products were labeled differently, they would buy them again – which they could not do if the products were the same as illegal steroids.

### d.     Plaintiffs' Claim for Injunctive Relief is Moot.

Welch's added the disclaimer to the 100% juice line in 2013.  (Mattsson-Boze Decl. ¶ 5.)  The discontinuance of the old label and the addition of the new "disclaimer" label moots any injunctive relief.  *Bronson v. Johnson & Johnson, Inc.,* No. C 12-04184 CRB, 2013 WL 1629191, at *1 n. 2 (N.D. Cal. Apr. 16, 2013) (discontinuance of product "renders moot Plaintiffs' request for injunctive relief related to those products"); *Anderson v. Hain Celestial Grp., Inc.*, 5:14-CV-03895-EJD, 2015 U.S. Dist. LEXIS 46708, at *22, (N.D. Cal. Apr. 8, 2015) (dismissing injunctive relief without leave to amend).

### E.     A Class Action Is Not Superior – Consumers Can Call Welch's Customer Service.

A class action is not a superior mechanism for addressing the claims of those few consumers who actually had a complaint about the Welch's products.  All they had to do was call the consumer hotline listed right on the product labels:  "Comments or questions?  Call **l-800-340-6870** Weekdays 9am – 4pm ET."  (**Exs. 12-16**, emphasis in original.)

Welch's maintains a customer service office under the management of Ms. Rosemary Spicer, the consumer affairs supervisor for Welch's, who has been with the company since 1971.  Welch's values consumer feedback, because it constantly seeks to improve its products and to retain consumer loyalty. (Spicer Decl. ¶ 4.)  All Plaintiffs had to do was call the consumer hotline, but they refused, and still refuse, to avail themselves of this readily available remedy:

Q.    If you look on the back of the 100% Grape Juice bottle right in front of you, do you see that there's a customer service number to call; it says, "comments or questions"?

A.    Where is the number?  Oh, yes, I do see.

Q.    **Did you ever call Welch's**, at any time, to complain about their hundred percent juice?

A.    **There was no reason at that time**.  **I would call it now, though.**

Q.    Have you?

A.    **No.**

(Park Depo. 81:21-82:6, emphasis added.)

Similarly, Otto knew full well that the customer service number is there to provide refunds and coupons, because she actually worked in a retail business that had just such a customer service number:

Q.    Yes.  And you understand the process whereby a consumer can call a customer service number and complain or raise an issue about a product, correct?

A.    Yes.

Q.    And sometimes that customer service will make an adjustment or refund or provide a coupon. You're familiar with that process, right?

A.    Yes.

Q.    And it's correct to say, that **you've never attempted to do that with regard to any Welch's product**; is that right?  [Objection omitted]

THE WITNESS:  **No, I did not**.

(Otto Depo. 58:19-59:8, emphasis added.)

Welch's points out this ready remedy for several reasons.  First, anyone who already received compensation directly has already been made whole.  Second, and more importantly, this is vastly less expensive than a class action lawsuit.  No lawyers are required and no judicial resources are consumed. And the value to consumers is much greater than the remedies dispensed through class actions.

In a growing trend, courts are recognizing that lawsuits are not always a superior method to resolve such minor consumer complaints.  In *In Re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013), the court reversed a class action settlement, noting that consumers already had access to refunds:

There is another reason to think the **reinstated refund program brings little value to unnamed class members: most of them have already had access to it.** . . . Thus, before this settlement agreement was even reached, consumers who purchased Pampers during a 29 — month period — of the 38 months encompassed by the class definition — had already had an opportunity to obtain their single-box refund, without the assistance of class counsel and without assigning away important rights as captive members of a settlement class.  That is all the more reason to doubt the parties' assertions of value.

*Id*. at 719 (emphasis added).

23

The *Dry Max* court cited *In Re Aqua Dots Prods. Liab. Litig.,* 654 F.3d 748, 752-53 (7th Cir. 2011), in which Judge Easterbrook noted that in addition to considering whether a Plaintiffs who would create these kind of transaction costs (notwithstanding an existing voluntary recall remedy) is "adequate" within the meaning of rule 23(a)(4), a court should also consider that:

> [I]ndividual notice would be impossible, which would make it hard for class members to opt out.  No one knows who bought the kits.  No one knows who used them without problems; this would make it difficult if not impossible to determine who would be entitled to a remedy.  The per-buyer costs of identifying the class members and giving notice would exceed the price of the toys (or any reasonable multiple of that price), leaving nothing to be distributed.  The principal effect of class certification, as the district court recognized, would be to induce the defendants to pay the class's lawyers enough to make them go away; effectual relief for consumers is unlikely.

*Id.* at 752-53.

The Southern District of California followed *Aqua Dots* in denying class certification with prejudice in *Waller v. Hewlett-Packard Co.,* 295 F.R.D. 472, 488-89 (S.D. Cal. 2013), holding that a voluntary recall/refund program obviated the high transaction costs Plaintiffs and their counsel sought to impose.[4]  In *Webb v. Carter's, Inc.,* 272 F.R.D. 489 (C.D. Cal. 2011), the court denied certification of a class of garment buyers, concluding that "a class action is not superior because [Defendant] is already offering the very relief that Plaintiffs seek: it allows consumers to obtain refunds for the garments, even without a receipt, and reimburses consumers for out-of-pocket medical costs for treating skin irritation resulting from the tagless labels."  *Id.* at 504.

California state courts denied class certification in food label cases on similar grounds.  In *Caro v. Procter & Gamble Co.,* 18 Cal. App. 4th 644 (1993), the court affirmed denial of class certification because Defendants submitted evidence indicating every package of Citrus Hill Fresh Choice orange juice included a toll-free telephone number for consumer comments and complaints; and consumers calling such number and expressing dissatisfaction were given coupons for replacement products or a

---

[4]  In *Waller v. Hewlett-Packard Co.,* the court denied class certification where a software update eliminated any problems complained of, noting that the update was relevant to adequacy, superiority, and standing.  295 F.R.D. 472, 489 (S.D. Cal. 2013) ("[E]ven if the SimpleSave update doesn't impact the class action analysis on the predominance prong, it very well may impact the analysis on some other prongs [such as superiority and adequacy]. . . . Having given serious consideration to the significance of HP's software update for the SimpleSave to Waller's motion for class certification, the Court finds that this is the analytical juncture at which the motion fails.").

refund of the purchase price." *Id.,* at 660 n.10.  "'However, because group action is also capable of injustice, the representative plaintiff must show substantial benefit will result both to the litigants and to the court.' . . . 'A factor in determining feasibility of the group approach is the probability each member will come forward ultimately, identify himself and prove his separate claim to a portion of the total recovery.  However, when potential recovery to the individual is small and when substantial time and expense would be consumed in distribution, the purported class member is unlikely to receive any appreciable benefit.'"  *Id.* at 657 (quoting *Blue Chip Stamps v. Superior Court*, 18 Cal. 3d 381, 385 (1976)) (citations omitted).  The court noted that the primary beneficiaries of the class action are the putative class counsel, and such benefit is not a sufficient reason for certifying a class.  "To allow this is 'to sacrifice the goal for the going,' burdening if not abusing our crowded courts with actions lacking proper purpose.'" *Id.* at 662 (quoting *Blue Chip Stamps*, 18 Cal. 3d at 386) (citations omitted).

This cost-benefit analysis should factor into the class certification decision.  If Plaintiffs prevailed at trial, class members would still have to prove that they purchased the products.  To obtain any benefit, consumers would have to take far more elaborate and time-consuming actions than simply calling the toll-free number.  The payout to consumers through the class action would be less generous than the remedy Welch's already provides voluntarily, and the transaction costs (including attorneys' fees) would be much higher.  Thus, in this case, a class action is plainly not a superior remedy.

## IV.   <u>CONCLUSION</u>

This case is not appropriate for class certification.  Plaintiffs' motion should be denied.

DATED:  June 26, 2015                    GREENBERG TRAURIG, LLP


By:      */S/ Rick L. Shackelford*
                                               Rick L. Shackelford
                                               Adam Siegler
                                               Attorneys for Defendant,
                                               Welch Foods, Inc., A Cooperative

LA 131962355v7

DEFENDANT WELCH'S OPPOSITION TO PLAINTIFFS' CLASS CERT MOTION
*Case No. CV12-06449-PSG*