1  Pierce Gore (SBN 128515)
   PRATT & ASSOCIATES
2  1871 The Alameda, Suite 425
   San Jose, CA 95126
3  Telephone: (408) 369 0800
   Fax:  (408) 369-0752
4  pgore@prattattorneys.com

5  Richard Barrett (admitted *pro hac vice*)
   Barrett Law Group, PA
6  2086 Old Taylor Road, STE 1011
   Oxford, Mississippi 38655
7  Tel: 662-380-5018
   Fax: 866-430-5459
8  rrb@rrblawfirm.net

9
   *Attorneys for Plaintiffs*
10

11            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
12                   SAN JOSE DIVISION

13  ELIZABETH PARK and CAROLYN          Case No. C12-06449 PSG
    OTTO, individually and on behalf of all others
14  similarly situated,
                                        **PLAINTIFF'S RESPONSE IN**
15              Plaintiffs,             **OPPOSITION TO DEFENDANT'S**
                                        **MOTION FOR PARTIAL SUMMARY**
16         vs.                          **JUDGEMENT**

17  WELCH FOODS, INC.

18              Defendant.             Hearing Date:    October 20, 2015
                                       Time:            10:00 a.m.
19                                     Judge:           Hon. Paul S. Grewal
                                       Action Filed:    December 20, 2012
20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3  *Boschma v. Home Loan Ctr., Inc.*,
4     198 Cal. App. 4th 230, 129 Cal. Rptr. 3d 874 (2011).......................................................4-5

5  *Brockey v. Moore*,
      107 Cal. App. 4th 86, 131 Cal. Rptr. 2d 746 (2003)......................................................... 22

6  *Clemens v. DaimlerChrysler Corp.*,
7     534 F.3d 1017 (9th Cir. 2008).......................................................................................... 22

8  *Colgan v. Leatherman Tool Grp., Inc.*,
      135 Cal. App. 4th 663, 38 Cal. Rptr. 3d 36 (2006)........................................................... 22

9  *Consumer Advocates v. Echostar Satellite Corp.*,
10    113 Cal. App. 4th 1351, 8 Cal. Rptr. 3d 22 (2003)........................................................... 23

11 *Edwards v. High Desert State Prison*,
      2013 U.S. Dist. LEXIS 27916 (E.D. Cal. Feb. 27, 2013) .................................................. 4

12 *Gitson v. Trader Joe's Co., ,*
13    *2013 U.S. Dist. LEXIS 144917 (N.D. Cal. Oct. 4, 2013)*....................................................20

14 *Herron v. Best Buy Co.*,
      924 F. Supp. 2d 1161 (E.D. Cal. 2013) ............................................................................. 4

15 *Hinojos v. Kohl's Corp.*,
16    718 F.3d 1098 (9th Cir. 2013)........................................................................................... 23

17 *In re Steroid Hormone Product Cases*,
      181 Cal.App.4th 145, 104 Cal.Rptr.3d 329 (2010)........................................................... 23

18 *In re Tobacco II Cases*,
19    46 Cal. 4th 298 (2009) ..................................................................................................... 23

20 *Jones v. Conagra Foods, Inc.*,
      912 F. Supp. 2d 889 (N.D. Cal. 2012)............................................................................. 14

21 *Kane v. Chobani, Inc.*, 2013 U.S. Dist. LEXIS 98752 (N.D. Cal. July 12, 2013)........................... 5

22 *Lockwood v. Conagra Foods, Inc.*,
23    597 F.Supp.2d 1028 (N.D. Cal. Feb. 3, 2009)...................................................................17

24 *Morgan v. AT&T Wireless Servs., Inc.*,
      177 Cal. App. 4th 1235, 99 Cal. Rptr. 3d 768 (2009).......................................................... 5

25 *Ogden v. Bumble Bee Foods, LLC*,
26    2014 U.S. Dist. LEXIS 565 (N.D. Cal. Jan. 2, 2014) ......................................................... 4

27 *Park v. Cytodyne Technologies, Inc.*,2003 WL 21283814 (Cal. Superior May 30, 2003) ........... 22

28 *Ries v. Ariz. Bevs. United States Llc, Hornell Brewing Co.*,
      287 F.R.D. 523 (N.D. Cal. 2012)...................................................................................... 23

*Rutledge v. Hewlet-Packard Co.,*
    238 Cal. App. 4th (2015) .................................................................................... 5

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.,*
    642 F. Supp. 2d 957 (N.D. 2008) ..................................................................... 22

*Williams v. Gerber Prods. Co.,*
    552 F.3d 934, 2008 U.S. App. LEXIS 27484, *12 (9th Cir. Cal. 2008) ............................ 11

**Statutes**

7 U.S.C. § 6502(21) ....................................................................................... 16

Cal. Health and Safety Code § 110398 ......................................................... 13

Cal. Health and Safety Code § 110400 ......................................................... 13

Cal. Health and Safety Code § 110660 ......................................................... 13

**Rules**

FED. R. CIV. P. 56(a) ...................................................................................... 4

**Regulations**

21 C.F.R. § 101.22 ......................................................................................... 17

21 C.F.R. § 173.280 ....................................................................................... 20

21 C.F.R. § 182.3013 (sub D) ........................................................................ 20

21 C.F.R. § 184.1033 ..................................................................................... 20

58 Fed. Reg. 2302 (Jan. 6, 1993) .................................................................. 17

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ...............................................................................II

STATEMENT OF ISSUES TO BE DECIDED............................................................V

I.      INTRODUCTION................................................... 1

II.     LEGAL STANDARD FOR SUMMARY JUDGMENT ........................ 1

III.    Plaintiff's Claims Under the UCL, FAL and CLRA............................... 2

IV.     PLAINTIFFS HAVE ESTABLISHED A QUESTION OF FACT AS TO
        WHETHER "NO SUGAR ADDED" WITHOUT THE REQUIRED
        DISCLOSURE WAS BOTH MISLEADING AND UNLAWFUL. ...................... 5

V.      DEFENDANT HAS NOT MET ITS BURDEN REGARDING ITS "ALL
        NATURAL" CLAIMS............................................................ 9

VI.     Plaintiff's Claim are Based On Violation Of Sherman Law ................................. 10

VII.    Plaintiff Has Evidence That The Citric Acid Used In The Products Is Not
        Natural And Is Rather A Synthetic, Chemical Preservative ................................. 17

VIII.   Consumer Surveys Are Not Required .................................................. 18

IX.     There Is A Genuine Dispute Of Material Fact Whether An "All Natural "
        Claim Is Material To Consumers ...................................................... 18

        1. Legal Standards Regarding "Materiality" ...................................... 18

X.      PLAINTIFF HAS ESTABLISHED ALL ELEMENTS OF MISLEADING
        ACTIONS AND FRAUD ............................................................ 20

XI.     DEFENDANT'S PRODUCTS ARE UNLAWFULLY MISBRANDED ............ 20

XII.    DEFENDANT HAS FAILED TO MEET ITS BURDEN TO SHOW
        PLAINTIFFS' CLAIM FOR IMPLIED BREACH OF WARRANTY
        FAILS............................................................................ 21

XIII.   Products were not fit for the ordinary purpose which Plaintiffs purchased
        them:............................................................................. 24

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF ISSUES TO BE DECIDED**

1.     Should Welch's be granted summary judgment when Plaintiff has substantial evidence, viewed in Plaintiff's favor, that a reasonable consumer like Plaintiffs could be misled and deceived by Defendant's labels that say "No Sugar Added" and  "All Natural," "No Artificial Flavors," or "No Artificial Preservatives?"

2.     Should Welch's be granted summary judgment when Plaintiff has substantial evidence, viewed in Plaintiff's favor, that the products at issue contain artificial and synthetic ingredients but advertise themselves as "All Natural," "No Artificial Flavors," or "No Artificial Preservatives?"

3.     Should Welch's be granted summary judgment when Plaintiff has substantial evidence, viewed in Plaintiff's favor, that the label claim "No Sugar Added" and  "All Natural," "No Artificial Flavors," or "No Artificial Preservatives" are material to reasonable consumers?

4.     Should Welch's be granted summary judgment on Plaintiff's UCL "Unlawful" claim where the illegal act is predicated in part on the violation of the Sherman Law § 110660 forbidding "misleading" labels?

5.     Is summary judgment appropriate on Plaintiff's Breach of Implied Warranty Claim where Plaintiff has established by substantial evidence that Defendant has violated one or more of Section 2(a) of Cal U Com Code § 2314?

1

2    **I.      INTRODUCTION**

3         For the reasons set out below, Defendant's Motion for Partial Summary Judgment must be

4    denied.  Defendant has not met its burden to establish that no triable  issue of material fact exists

5    regarding Plaintiffs' No Sugar Added and All Natural claims. Plaintiffs Carolyn Otto and

6    Elizabeth Park have provided substantial evidence the Defendant's 100% Juice and All Natural

7    Spreads were misleading and in violation of California food labeling laws.  Further, Plaintiff has

8    provided evidence of Defendant's breach of implied warranty of merchantability.

9

10   **II.     LEGAL STANDARD FOR SUMMARY JUDGMENT**[1]

11        The whole purpose of summary judgment is to "see whether there is a genuine need for

12   trial." *Edwards v. High Desert State Prison*, 2013 U.S. Dist. LEXIS 27916, 6 (E.D. Cal. Feb. 27,

13   2013).  A grant of summary judgment is appropriate when "there is no genuine dispute as to any

14   material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

15   56(a). Material facts are those that may affect the outcome of the case.  *Ogden v. Bumble Bee*

16   *Foods, LLC*, 2014 U.S. Dist. LEXIS 565, 17 (N.D. Cal. Jan. 2, 2014) (LHK).  A dispute as to a

17   material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

18   the nonmoving party. *Id*. at 17-18.  The party moving for summary judgment bears the initial

19   burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate

20   the absence of a genuine issue of material fact.  *Id*. at 18.  Once the moving party meets its initial

21   burden, the nonmoving party must go beyond the pleadings, and by its own affidavits or

22   discovery, set forth specific facts showing that there is a genuine issue for trial. *Id*.

23        At the summary judgment stage, the Court must view the evidence in the light most

24   favorable to the nonmoving party, here the Plaintiff, and "all reasonable inferences that may be

25   ————————————————

26   [1] As an initial matter, Plaintiff objects to Welch's references and incorporation of arguments in its
     Response to Plaintiffs'' Motion for Class Certification as an improper way to circumvent the page
27   limits as set by the Court.  Plaintiff responds to this motion by itself.  If the Court should allow,
     summary judgement argument in Defendant's class certification briefing, Plaintiff requests an
28   allowance to reply to those arguments on a summary judgement basis as opposed to a class
     certification basis.

1    drawn from the facts placed before the court must be drawn in favor of the opposing party." *Id.* at

2    18.  If evidence produced by the moving party conflicts with evidence produced by the

3    nonmoving party, a court must assume the truth of the evidence set forth by the nonmoving party

4    with respect to that fact.  *Id.* at 19.

5                        **a.  Plaintiff's Claims Under the UCL, FAL and CLRA**

6          The UCL is "to be liberally construed and applied to promote its underlying purposes of

7    consumer protection." *Herron v. Best Buy Co.*, 924 F. Supp. 2d 1161, 1172 (E.D. Cal. 2013).

8    UCL liability exists not only for untrue representations, but also for a "perfectly true statement

9    couched in such a manner that it is likely to mislead or deceive the consumer." *Morgan v. AT&T*

10   *Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1255, 99 Cal. Rptr. 3d 768 (2009).  Thus a

11   statement that "may be accurate on some level, but will nonetheless tend to mislead or deceive" is

12   actionable under the UCL.  *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 253, 129

13   Cal. Rptr. 3d 874 (2011). "In order to prevail on Plaintiffs' FAL, CLRA, UCL fraud prong

14   claims, and Plaintiffs' UCL unlawful prong claim predicated on FAL and CLRA violations,

15   Plaintiffs must satisfy the "reasonable consumer" test, which requires Plaintiffs to show that

16   members of the public are likely to be deceived by Defendant's labeling statements." *Kane v.*

17   *Chobani, Inc.*, 2013 U.S. Dist. LEXIS 98752, 34 (N.D. Cal. July 12, 2013) (LHK).  If both sides

18   "have presented evidence" as to what is or is not misleading to a reasonable consumer "then there

19   is a genuine dispute of material fact on this issue" and summary judgment is inappropriate.

20   *Ogden,* 2014 U.S. Dist. LEXIS 565, 35 fn. 9.  Such evidence can be, among other things,

21   testimony from the class representative.  *Id*. "A court's primary function in evaluating a summary

22   judgment motion is to identify issues rather than to determine them.  If the evidence is in conflict,

23   the factual issues must be resolved by trial. Thus, should the court determine that triable issues of

24   fact exist, the summary judgment motion must be denied. There is to be no weighing of the

25   evidence." *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1167 (2015).

26      **III.     PLAINTIFFS HAVE ESTABLISHED A QUESTION OF FACT AS TO
                  WHETHER "NO SUGAR ADDED" WITHOUT THE REQUIRED**

27              **DISCLOSURE WAS BOTH MISLEADING AND UNLAWFUL.**

28          Defendant spends a significant amount of its brief declaring that the concentrated fruit

juice in all of its 100% Juices at issue are reconstituted to the fruits natural "brix" level of sweetness.  This is merely an attempt by Defendant to steer this honorable Court away from the main issue it should address with regard to whether Plaintiffs have shown reliance on the misleading nature of Defendant's "No Sugar Added" (hereafter, "NSA") claim.  Even assuming that the Brix level of Defendant's reconstituted juice is the same as freshly pressed fruit juice, Plaintiffs understanding of the NSA claim shows that a question of fact exists whether it was misleading and thus misbranded.  "The question of whether a manufacturer's representation about a product is specific, and was relied upon by a consumer should be decided by a trier of fact." *Rutledge*, at 1176.   There is no question that Plaintiffs relied upon the "No Sugar Added" claim as a material statement that the product was a healthier and lower calorie choice for them and their families.   "A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question' [citations], and as such materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *Id.,* quoting, *Engalla v. Pemanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 [64 Cal.Rptr.2d 843, 938 P.2d 903].

Mrs. Elizabeth Park purchased Defendant's 100% Juices because she wanted to provide "a low calorie food product for my family."   Deposition of Elizabeth Park at 121:2-3[2]  She testified that that she believed the NSA claim to mean that the Welch's product was indeed a low calorie option:

> 14  Q. Other than what your attorneys may have
> 15  told you, what is the factual basis for your claim
> 16  with regard to added sugar?
> 17  A. That I repeatedly purchased a product where
> 18  I read "no sugar added, 100% Grape Juice," and
> 19  purchased it, and think -- believing that it was a
> 20  low-calorie product.

Carolyn Park Deposition at 121:14-20.  She further stated that "I'm not a bean counter- I don't count and investigate each product. **But when I look at the label and I see "no sugar added,"**

---

[2] The full deposition transcript of Elizabeth Park is attached as Exhibit B to the Declaration of Richard R. Barrett filed in support of Plaintiffs arguments against summary judgment and hereto incorporated.

1    **what that means to me is that it's a low-calorie food.**  Id. at 71:11-14.

2    Counsel for Welch's kept after her, but Mrs. Park's position did not change.  He continued,

3
         11  Q.  Is there any one of these components or
4        12  factors that you've described that takes precedence
         13  over the others?
         14  A.  I would say the calories.  Low-caloric
5        15  foods are a staple in our family.  And again, I
         16  sound like a broken record, I'm afraid.  But when I
6        17  bought this with the -- looking at the label with
         18  the "no sugar added," I made the general assumption
7        19  it was a healthier low-calorie food for my family.

8    (Id. at 76:11-17.)  Likewise, the testimony of the other named plaintiff, Mrs. Carolyn Otto,

9    establishes that she too makes low sugar or no sugar option choices when available (Deposition of

10   Carolyn Otto at 65:20-66:6) and that she believed that the NSA claim meant that it was a

11   healthier, low calorie option for her and her family.[3]  She testified:

12
          1  [. . . .] tell us which sections of the
13        2  front of the package you read and relied on in
          3   making your purchase decision.
14        4   A.  The "no sugar added" (indicating).
          5  Q.  What did that "no" -- you're pointing
15        6   to -- there's a yellow circle with a green circular
          7   insert inside the yellow circle that reads "no sugar
          8   added."  What did that logo mean to you when you
16        9   bought this product?
          10  A.  That I was buying a product that had no
17        11   sugar.  It was low in calories.

18   (Deposition of Carolyn Otto at 171:1-11)  It is no wonder that Plaintiffs believed as they did as

19   this is the exact type of result that the FDA has warned against as the likely result of a NSA

20   claim.  In explaining the reasoning behind the requirement of a disclosure on NSA claims that are

21   not low calorie, the FDA stated:

22
              As is the case for foods in conventional food form, the agency
23            believes that to avoid misleading consumers, the term ``no added
              sugar'' should be limited to [ ] [foods] that would be expected to contain
24            added sugars.  **The agency advises that the purpose of a ``no added
              sugar'' claim is to identify a food that differs from a similar food
25            because it does not contain the added sugars that would normally be
              present in the similar food**.  [ . . .] The agency
26            believes that claims concerning the absence of added sugars on products
              that would not normally contain added sugar [ ] **are likely to mislead**

27   _____

28   [3] The full deposition transcript of Carolyn Otto is attached as Exhibit C to the Declaration of
     Richard R. Barrett filed in support of Plaintiffs arguments against summary judgment and hereto
     incorporated.

**consumers into thinking that a particular brand may be more desirable when compared to other brands of the same product**.

59 FR 378.[4]  Likewise, Plaintiffs' expert, Dr. Julie Caswell, confirmed what the FDA states above is material to purchasers despite the fact that the claim might be true when she testified that "a statement can be true and still misrepresent the product."  (Deposition of Julie Caswell at 58:20-21, Ex. D to Declaration of Richard R. Barrett)   Defendant's motion for summary judgment on the NSA claim must be denied because Plaintiffs have shown clearly that they reasonably relied upon the NSA claim that did not include a disclaimer of not being a low calorie food and that they were each mislead by that assertion.

Lastly, Defendant argues that Plaintiffs have admitted that they would purchase Defendant's 100% Juices if they were properly labeled and thus could not have relied upon the NSA claim when they purchased the juices before filing their suit.  This argument fails.  Defendant's argument assumes that Plaintiffs would be purchasing Welch's 100% juices for the same purpose as they did before filing suit.  However, the evidence supports the opposite.  While Plaintiffs purchased Welch's 100% Juices as a low calorie drink for their family in the past, they now each would purchase the juices as a sugary treat.  *See,* Declarations of Elizabeth Park and Carolyn Otto attached hereto as Exhibits B and C, respectfully.

## IV.   DEFENDANT HAS NOT MET ITS BURDEN REGARDING ITS "ALL NATURAL" CLAIMS.

### 1.   Plaintiff Otto Relied On Welch's False All Natural Claim

In trying to argue that the Plaintiff did not rely on Welch's "all natural" claim, Defendant completely ignores Plaintiff Otto's repeated testimony confirming that she relied on Welch's false and misleading front of package "all natural" claim on its Strawberry fruit spread products and was misled.  For example, as made clear by the excerpts below, Otto testified that she bought the product because it was labeled natural and that she was misled because it was not natural because

---

[4] The FDA was for the included quote dealing with the final rule of a NSA claim in vitamins and supplements, but as show above, applies the same findings to conventional foods.  Further, the FDA applied the same warnings against conventional foods in previous findings. "Claims concerning the absence of added sugars on products that would not normally contain added sugars, for example canned tuna or potato chips, are likely to mislead consumers into thinking that a particular brand may be more desirable when compared to other brands of the same product."  56 FR 60421

it had citric acid which was a chemical and a preservative.

7    Q. I want to ask you the same questions
8    essentially about the Welch's Natural Strawberry
9    Spread. Can you tell us in your own words, what
10   exactly is your claim with respect to this product?
11   A. The reason I purchased it was because it
12   said it was natural.
13   Q. And what have you come to learn or believe
14   about this product?
15   A. That it is not --that it is not natural;
16    that there is citric acid in it.
17   Q. Is there --is this the difference you
18   were talking earlier about the difference between
19   citric acid that occurs naturally in fruit and
20   citric acid that is added as a preservative?
21   A Yeah--yes.
25   Q. I want to ask you the purpose question

1.    again. What was your purpose in buying this
2    product, this Welch's product labeled "natural" and
3    "all natural" as opposed to some other fruit spread
4    product you could have purchased?
5    A. The fact that it was all natural, that
6    there wasn't any --there were no preservatives in
7    it.
8    Q. Did this product fulfill that purpose?
9    A. No.

Otto Dep. 173:7 -174:9.

15   And you state in your declaration, "I
16   believed that 'all natural' meant that there were no
17   added chemicals in the spreads. That was a lie.
…
1    Q.Let me ask it a different way. What is
2    the chemical that you are suing Welch's about?
3    A. Well, I'm suing --there's --there's
4    chemicals in here. There's citric acid ….

Otto Dep. 110:15-17, 111:1-4..

20   Q. Other than your  belief  that citric acid is
21   a preservative, do you have any other objection to
22   the use of citric acid in the Welch's Natural
23   Strawberry Spread?
…
1    A It's not natural.

Otto Dep. 114:20-23, 116:1

The Plaintiff also submitted a sworn affidavit on this point as well where she stated:

> 8. To me (and I believe to any reasonable consumer) any monetary value purportedly received by me attributable to some aspect of Welch's 100% Juices or Natural Spreads I purchased such as its calorific value or taste would have been more than negated by the negative monetary value attributable to the product being misbranded and illegal to buy and sell under California law.

> 9. I would not have bought Welch's 100% Juices or Natural Spreads had I known it was misbranded and was illegal to sell or hold under California law. To me a product that is illegal to sell or hold under California law is worthless and has a value of zero. I would not willingly participate in an illegal sales transaction even if my participation did not subject me to any legal risk or consequences.
> ….
> 11. I was misled by the all-natural claim of the Welch's Natural Spreads. The product contains manufactured chemicals that are not "all natural." I believed that "all natural" meant that there were no added chemicals in the spreads. That was a lie.

> 12. Because I choose to deal with honest companies that do not violate food labeling laws designed to protect consumers like me from deception and fraud and to safeguard the public health, I would not have knowingly purchased a product from a company that violated such food labeling laws. The products of such companies have no monetary value to me because I would not knowingly purchase them.

> 13. In my opinion, any product that could subject a person to a fine or imprisonment for selling or holding it would have a significant negative monetary value as you could not pay me to break the law by selling or holding such a product.

Dkt.57-2, ¶¶ 8-9,11-13. Otto Dep. 60:22-24.

Welch disingenuously argues that Otto continued to act in ways inconsistent and contrary to her stated claims but this is not true. Otto testified that she stopped buying the Welch's products in question and in fact stopped buying all Welch's fruit spreads and all strawberry fruit spreads. Otto Dep. 60:22-24. She indicated that while it had not been her normal practice to look at the back of a product's label, that since learning of Welch's deception she undertook to double check the veracity of front of label natural claims like the "all natural" claim to prevent being misled again by a false all natural label. Otto Dep. 57:8-10; 116:24-25-117:1-2. This is actually more than is required by 9th Circuit which has held that:

> We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box. The ingredient list on the side of the box appears to comply with FDA regulations and certainly serves some purpose. We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception. Instead, reasonable consumers expect that the ingredient list contains more detailed information about  [940] the product that

confirms other representations on the packaging.

*Williams v. Gerber Prods. Co.,* 552 F.3d 934, 939-940, 2008 U.S. App. LEXIS 27484, *12 (9th Cir. Cal. 2008).

Welch tries to undercut the Plaintiff's testimony by arguing that some the other non-Welch's food products purchased by Plaintiff contained citric acid. Defendant's attempt is unavailing for several reasons. First, it is the Welch's "all natural" products that are issue and not some completely different non-Welch's products. Second, Plaintiff testified that her concern was with a false and misleading "all natural" claim that was false and misleading because of the presence of an unnatural ingredient like citric acid.  Welch's has produced no evidence that the Plaintiff continued to purchase products with citric acid that were labeled all natural. To the contrary, the Plaintiff pointed out that the absence of any "natural" claim when questioned about a particular product that contained citric acid.  Otto Dep. 132:11-16.  The Defendant has also failed to produce any evidence showing the source or nature of any citric acid in any other product purchased by the Plaintiff and thus cannot establish that such citric acid was artificial or unnatural.

Equally unavailing are Welch's attempt to argue that all citric acid is natural using the Plaintiff's testimony. The Plaintiff made clear that she drew a distinction between naturally occurring citric acid from citrus fruit and the unnatural type used by manufactured by man and used by Welch's as indicated by the following excerpt:

        24    Q. Okay. What is the difference in your mind
        25     between citric acid that occurs naturally in citrus
        1      fruit and citric acid that is manufactured and added
        2       to packaged foods?
        3      A. Well, citric acid that is in fruit is a
        4       natural process and citric acid that is added in is
        5      produced in a factory.
        6      Q. Why would you be okay with one and not
        7      okay with the other?
        8      A. One is natural. One is not.

Otto Dep. 166:24-25-167:1-8.

Welch's further distorts the record by arguing that Plaintiff's reason for believing citric acid was toxic or unhealthy was based on its name alone without acknowledging that the following interchange where the Plaintiff made clear her concerns about  the unnaturalness of the

citric acid at issue took place immediately after the except quoted by Welch:

> 23    Q. Other than what your counsel have told
> 24    you, what is the basis for your belief that citric
> 25     acid is toxic or unhealthy?
> 1     A It's not natural.

Otto Dep. 115:23-25-116:1.

The Plaintiff contends that the above excerpts demonstrate the Plaintiff's reliance on Welch's false and misleading front of package "all natural" claim. At the very least however, they create a disputed question of fact on the issue precluding summary judgment.

## V.    Plaintiff's Claim are Based On Violation Of Sherman Law

Contrary to Welch's argument, Welch's false and misleading front of package Plaintiff is governed by regulation has alleged that Welch's fruit products are unlawful because, among other things, Welch's use of  the claim "all natural" is false and misleading under Cal. Health and Safety Code § 110660 which provides that "[a]ny food is misbranded if its labeling is false or misleading in any particular.[5] Despite this, Welch's misconstrues Plaintiff's allegations and argues that summary judgment is warranted because Plaintiff's action depends on a violation of FDA policy, which is not a "law" and thus the Plaintiff's claims can be premised upon this policy.

The Sherman Law expressly prohibits false and misleading food labeling and advertising. *See* Cal. Health and Safety Code § 110660, 110398, 110400.[6, 7]  It also prohibits the sale of misbranded products. Cal. Health and Safety Code § 110760. Thus to the extent Welch's "all natural" claim is deemed either false or misleading it will violate the Sherman law and render the

---

[5] Third Amended Complaint, Dkt. No. 36, ¶¶ 59-72 ("Any food is misbranded if its labeling is false or misleading in any particular.").

[6] Furthermore, whether Welch's use of "All Natural" on its food labels is false and misleading is a fact question for the jury that is not contingent upon a formal regulation enacted by FDA.  FDA was aware of and reviewed state regulations regarding the term natural, but made no mention of the need for uniformity in administration regarding use of the term "natural." *Jones v. Conagra Foods, Inc.*, 912 F. Supp. 2d 889, 898 (N.D. Cal. 2012). This case "is far less about science than it is about whether a label is misleading." *Id.*

[7] Welch's also argues that because citric is an ingredient (instead of an artificial flavor or preservative), the use of these ingredients does not have to be disclosed as required by 21 C.F.R. § 101.22 and Cal. Health and Safety Code § 110740. But, Welch's fails as Plaintiff has submitted evidence that citric acid are chemical preservatives and artificial flavors.  Thus, Welch's must disclose the function of these ingredients on its food labels.  21 C.F.R. § 101.22(j).  Welch's never disclosed the function of citric acid on any of its products. This helped conceal the falsity of its "all natural claim"

food misbranded and illegal.

**VI.      Plaintiff Has Evidence That The Citric Acid Used In The Products Is Not Natural And Is Rather A Synthetic, Chemical Preservative**

Whether or not Welch's fruit spread products are "All Natural" is a textbook example of a fact dispute not suitable for summary judgment.  Welch's contends that its products are "All Natural" despite the admitted presence of citric acid.  The evidence shows that the citric acid in the products is not natural and is instead synthetic and added as a chemical preservatives.

The FDA has also expressly stated in multiple warning letters that citric acid is "synthetic" and preservative as it violates the FDA policy when included in a product labeled "natural."[8]  The FDA has done so even when the food in question to which the citric acid is being added contains natural levels of citric acid. *See e.g.* August 29, 2001 FDA Warning Letter to Hirzel Canning Co. where the addition of  citric acid to tomatoes which naturally contain citric acid precluded the use of the term "natural" to describe the product.[9] Also, the Code of Federal Regulations indicates that in the process of making citric acid used by Welch's, synthetic residues remain in the citric acid.[10]

Plaintiff's expert Dr. Scarbrough has clearly stated that 1) the FDA believes that the addition of citric acid precludes the use of the term natural and that the citric acid used by Welch's is an industrial chemical that is a "synthetic product" which precludes the use of the term natural in Products that contain it. Scarbrough Dep, 55:13:-25-57:5; 68:7-25-69:22.[11]  Plaintiff's expert, Dr. Kurt Hong, also agrees and his entire report addresses this issue.[12]  Dr. Hong describes in detail the manufacturing history of citric acid that makes it synthetic, the process used to mass produce this ingredients (the *Aspergillus niger* process for citric), and citric acid's use as an additive and chemical preservative.[13]  Stated simply, "the citric acid added in the Welch's

---

[8] Hong Report, ¶¶39, 41 and fns. 30, 42 (three FDA warning letters regarding citric acid)

[9] Hong Report, ¶¶39 and fns. 30.

[10] 21 C.F.R. § 173.280; 21 C.F.R. § 184.1033.

[11] Attached to Declaration of Richard R. Barrett as Exhibit D.

[12] For brevity, Plaintiff will not repeat every statement made in Dr. Hong's report, but does incorporate all of his opinions and supporting facts in the report. The same is attached as Exhibit A to the Declaration of Richard R. Barrett.

[13] Hong Report, ¶¶31-47

1   Products is artificial and/or synthetic."[14]  It is also his opinion that citric acid is both an additive

2   and chemical preservative in the Welch's products.[15]  Plaintiff has evidence these ingredients are

3   really chemical preservatives.[16]

4          Citric Acid does not meet any definition of the term "natural" while it does meet the

5   definitions of artificial and synthetic. "Natural" is defined by the dictionary as "existing in nature

6   and not made or caused by people: coming from nature: not having any extra substances or

7   chemicals added: not containing anything artificial: usual or expected."[17] The U.S. Food and

8   Drug Administration ("FDA") has indicates on its website that "the agency has not objected to the

9   use of the term if the food does not contain added color, artificial flavors, or synthetic

10  substances."[18]

11         The FDA has also indicated that its policy on the use of the word natural on food labeling

12  is "that 'nothing artificial or synthetic (including all color additives regardless of source) has been

13  included in, or has been added to, a food that would not normally be expected to be in the food."[19]

14         Synthetic" is defined as "made by combining different substances: not natural."[20]  The

15  United States Department of Agriculture ("USDA") defines synthetic as "a substance that is

16  formulated or manufactured by a chemical process or by a process that chemically changes a

17  substance extracted from a naturally occurring plant, animal, or mineral source…"[21]

18         "Artificial" is defined as "not natural …: made, produced, or done to seem like something

19  natural:  not happening or existing naturally:  created or caused by people." Natural" substances

20  are distinguishable from substances that are either synthetic or artificial.  "Synthetic" ingredients

21  are those that are "man-made" or "produced by human beings" or "produced by chemical or

---

[14] Hong Report, ¶¶22

[15] *Id.* ¶¶ 22-47.

[16] Hong Report, ¶ 24, 34, 40-42, 45-46; 60 Fed. Reg. 49553 ("Organic acids, such as lactic, acetic, and citric, reduce pathogenic and spoilage microbial organism populations by altering the environmental pH and by direct bactericidal action"); 21 C.F.R. § 182.3013 (sub D;

[17] *Merriam-Webster.com*. 2015. http://www.merriam-webster.com (August 2015).

[18] http://www.fda.gov/aboutfda/transparency/basics/ucm214868.htm. ("Page Last Updated: 06/08/2015").

[19] 58 Fed. Reg. 2302. 2407 (1993); 1/6/14 FDA Letter (citing 58 Fed. Reg. 2302).

[20] *Merriam-Webster.com*. 2014. http://www.merriam-webster.com (August 2015).

[21] 7 U.S.C. § 6502(21)

1  biochemical synthesis" or "produced artificially especially by chemical means" or "something

2  resulting from synthesis rather than occurring naturally" regardless of whether it mimics a natural

3  substance.[22]

4       Foods and juices labeled "all natural" are correct, truthful and non-misleading when there

5  is an absence of artificial and *synthesized* ingredients (additives, sweeteners, preservatives,

6  hormones, or coloring) and contain only ingredients that are direct from nature or have only been

7  minimally processed (a process defined by the USDA as one that does not fundamentally does not

8  alter the raw product).[23] The FDA considers citric acid to be synthetic and artificial.[24] Leading

9  manufacturers of citric acid do not represent their citric acid as being natural in catalogs where

10  they identify the natural products they produce.[25]

11       The FDA's Natural Policy Does Not Contain Two Prongs.

12       Welch's wants the Court to believe that the Food & Drug Administration's ("FDA")

13  natural policy is akin to the elements of a cause of action.  As Welch's argues, if there are two

14  elements of the FDA policy and Plaintiff fails to offer proof of one element then Welch's is

15  entitled to summary judgment.  That is incorrect.  As stated previously, the FDA's natural policy

16  is relevant to Plaintiff's claims because it is proof of the FDA's position on what constitutes a

17  misleading label.  The policy gives the fact finder a resource to determine what is misleading and

18  deceptive, but the ultimate question rests with the trier of fact and even if a product does not

19  violate the FDA policy it can still be misleading because the FDA policy is a floor not a ceiling.

20  *See e.g. Lockwood v. Conagra Foods, Inc.*, 597 F.Supp.2d 1028 (N.D. Cal. Feb. 3, 2009),

21  plaintiffs contended that ConAgra misled the public by advertising its pasta sauce as "all natural,"

22  when in fact it contained high fructose corn syrup. *Id.* at 1029.

23       Welch's incorrectly attempts to raise the bar by taking FDA's natural policy and dividing

24

25  [22] *Merriam-Webster.com.* 2014. http://www.merriam-webster.com. (August 2015)
   [23] USDA Food Safety and Inspection Services, Food Standards and Labeling Policy Book
26  (August 2005).
   [24] August 16, 2001 FDA Warning Letter to Oak Tree Farm Dairy stating that use of "all natural"
27  on a label was inappropriate "because it contains citric acid."); August 29, 2001 FDA Warning
   Letter to Hirzel Canning Co. stating "therefore, the addition of calcium chloride and citric acid to
28  these products preclude the use of the term 'natural' to describe the product."
   [25] *See e.g.* Cargill ingredient Portfolio.

it into "two prongs." Def. Br., 3:11.  There is no evidence to support this position.  The FDA's policy is very clear:  "The agency has, however, stated that its policy regarding the use of the term 'natural' on food labeling means that 'nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food." 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993).[26]  The FDA also states on its website "the agency has not objected to the use of the term if the food does not contain added color, artificial flavors, or synthetic substances."[27]

Regardless, Plaintiff has evidence that Welch's violates this supposed second prong. "Synthetic" ingredients are "man-made and produced artificially regardless of whether it mimics a natural substance."[28]   "Artificial" ingredients are "created or caused by people."[29]   Food manufacturers, including Welch's, do not extract natural citric acid or ascorbic acid and inject this into foods because of the prohibitive cost.[30]  It goes without saying that man-made ingredients added to products would not normally be expected to be in food.

Citric acid is a chemical preservative. Citric acid meat the definition of a chemical preservative contained in  21 C.F.R. § 101.22(a)(5) ("[t]he term chemical preservative means any chemical that, when added to food, tends to prevent or retard deterioration thereof". While Welch's contends that its preserves do not need further preservation because of their acidity. It is citric acidity which provides that acidity and its preservative effect. The FDA also considers citric acid to be a chemical preservative.[31] An acidulant or pH control agent like citric acid is a type of food additive that acidifies a food inhibiting spoilage and having a preservative affect and thus is a type of preservative. Acidulants like citric acid can also impart a tart or sour or bitter taste to

---

[26] Hong Report, ¶ 26.

[27] FDA Website – August 25, 2014 ("What is the meaning of 'natural' on the label of food?"); Hong Report, ¶ 25 (citing FDA website).

[28] Hong Report, ¶ 29.

[29] Hong Report, ¶ 28.

[30] Hong Report, ¶¶ 38, 45.

[31] Oct. 6, 2010 Warning letter from the FDA to Chiquita Brands describing both ascorbic acid and citric acid as chemical preservatives;
http://www.fda.gov/Food/IngredientsPackagingLabeling/FoodAdditivesIngredients/ucm094211.htm

foods and serve as a flavor and is recognized as such. Citric acid is recognized by the FDA as both an acidulant and a preservative.[32]  The FDA recognizes that citric acid can serve as a preservative in food.[33]  Leading manufacturers of citric acid recognize its use as a preservative.[34]

Citric acid is a flavor, moreover, it is an artificial one. A flavor is a substance that imparts a taste or an aroma to food.[35] Citric acid provides a tart, citrus taste to foods. [36]

The Flavor and Extract Manufacturers Association ("FEMA") maintains its own GRAS list of flavoring substances that is specifically recognized by FDA as being reliable based on the scientific rigor with which FEMA conducts its analyses.  *See* 41 Fed. Reg. 4954 (Feb. 3, 1976). Citric acid is on the FEMA GRAS list (substance # 2306).  It was added to the FEMA GRAS list in 1965 as part of FEMA's List III of GRAS flavoring substances, which was published in the scientific journal, *Food Technology*, Vol. 19, No. 2. FDA has specifically recognized FEMA GRAS List III as reliable.  *See* 44 Fed. Reg. 71460, 71461 (Dec. 11, 1979). Because FEMA's GRAS expert panel members are considered to be experts qualified by scientific training and experience to evaluate safety, a substance "can legally be sold as soon as FEMA grants approval." *See Importers Serv. Corp. v. GP Chem. Equity LLC*, 476 Fed. Appx. 717, 718 (11th Cir. 2012).

Citric acid is on the FEMA GRAS list (substance # 2806).  It was added to the FEMA GRAS list in 1965 as part of FEMA's List III of GRAS flavoring substances, which was published in the scientific journal, *Food Technology*, Vol. 19, No. 2.  FDA has specifically recognized FEMA GRAS List III as reliable.  *See* 44 Fed. Reg. 71460, 71461 (Dec. 11, 1979) 24). Accordingly, citric acid is on a list of GRAS flavoring substances that has been recognized by FDA.  (Attached as Exhibit E to Declaration of Richard R. Barrett)

---

[32]
http://www.fda.gov/Food/IngredientsPackagingLabeling/FoodAdditivesIngredients/ucm094211.htm

[33] http://www.fda.gov/downloads/Food/IngredientsPackagingLabeling/UCM232699.pdf;
http://www.fda.gov/Food/IngredientsPackagingLabeling/FoodAdditivesIngredients/ucm094211.htm
[34] *See e.g.* http://www.sigmaaldrich.com/content/dam/sigma-aldrich/docs/SAFC/General_Information/1/safc_flavors_and_fragrances_catalog.pdf;
[35] *See e.g.* 21 CFR §170.3(o)(12).
[36] http://www.adm.com/en-US/products/food/Pages/beverages.aspx

1    The FDA recognizes that citric acid can serve as a flavor in food.[37]  Leading

2    manufacturers of citric acid recognize its use as a flavor .[38]

3    21 U.S.C. § 343(k) provides that "[a] food shall be deemed to be misbranded . . . . If it

4    bears or contains any *artificial flavoring*, . . . unless it bears labeling stating that fact" (emphasis

5    added); and 21 C.F.R. § 101.22(c) provides that "[a] statement of *artificial flavoring* . . . shall be

6    placed on the food or on its container or wrapper . . .") (emphasis added).  The definition of

7    "artificial flavoring" is set forth in 21 C.F.R. § 101.22(a)(1).  Citric acid as used in Welch Foods,

8    falls within this definition.  Defendant, however, attempts to distort the definition of "artificial

9    flavoring."  It asks the Court to ignore the definition of "artificial flavoring" in 21 C.F.R. §

10   101.22(a)(1) and to look to similar sounding terms in 21 C.F.R. § 170.3(o).  Defendant assert

11   that, to be subject to disclosure requirements, an ingredient must also meet the definition of

12   "flavoring agent" in 21 C.F.R. § 170.3(o)(12).  However, to the extent there is merit to Defendant'

13   assertion, the provisions of 21 C.F.R. § 170.3(o) make clear that, as used by Welch citric acid is

14   both an "artificial flavoring" under 21 C.F.R. § 101.22(a)(1) and a "flavoring agent" under 21

15   C.F.R. § 170.3(o)(12).

16   "Flavoring agents" are defined as "[s]ubstances added to impart or help impart a taste or

17   aroma in food."  *See* 21 C.F.R. § 170.3(o)(12).  Citric acid imparts or helps impart a taste or aroma

18   in Welch's fruit spread.  *See* AC at ¶¶ 52-67.   Indeed, Defendant admits that citric acid imparts a

19   tart taste .  Regardless, whether an ingredient "impart[s] or help[s] impart a taste or aroma in food"

20   is a question of fact.  *See Gitson v. Trader Joe's Co., 2013 U.S. Dist. LEXIS 144917 (N.D. Cal.*

21   *Oct. 4, 2013)*, at *4 (whether ingredients "function as artificial flavors, chemical preservatives, or

22   both, is inappropriate to determine at this stage of the litigation")

23   Significantly, nothing in 21 C.F.R. § 170.3(o)(12) requires that a "flavoring agent" provide a

24   product's "characteristic" taste.  Defendant attempt to confuse and conflate the definitions of

25   "artificial flavoring," "flavoring agent," and "flavor enhancer."  Of the three, the only one that

---

[37] http://www.fda.gov/downloads/Food/IngredientsPackagingLabeling/UCM232699.pdf;
http://www.fda.gov/Food/IngredientsPackagingLabeling/FoodAdditivesIngredients/ucm094211.htm

[38] *See e.g.* http://www.sigmaaldrich.com/content/dam/sigma-aldrich/docs/SAFC/General_Information/1/safc_flavors_and_fragrances_catalog.pdf

includes the word "characteristic" is the definition of "flavor enhancer."  That definition, however, does not refer to the "characteristic" taste or aroma of a final product, but of the "characteristic" taste or aroma *of the ingredient*, itself.   21 C.F.R. § 170.3(o)(11) provides that a "flavor enhancer" is a "[s]ubstance[] added to supplement, enhance, or modify the original taste and/or aroma of a food, without imparting a characteristic taste or aroma **of its own**"  (emphasis added).  Defendant wholly ignores the last three words of this definition.  This definition clearly refers to a "characteristic taste or aroma" *of the ingredient*, and not of the product to which it is added.

FDA elaborates that "[g]enerally, *a flavoring is considered to be a substance that has a flavor of its own at the level at which it is used in a food, while flavor enhancers and flavor potentiators do not themselves impart flavor but rather intensify in some manner the flavors that are naturally present or are added to food.*"  *See* 56 Fed. Reg. 28592-01, 28598 (June 21, 1991) (emphasis added).  In other words, "flavor enhancers" do not impart any taste distinct from the tastes already present in food, but merely intensify those previously existing tastes.[39]  There is no basis to Defendant' assertion that the definitions of "flavoring agent" and "flavor enhancer" in 21 C.F.R. § 170.3(o)(11) and (12) must be read together.  Yet, even if there was a basis, to be a "flavoring agent," citric acid would still only need to impart its own characteristic tart taste into the fruit spreads, and would not need to provide the "characteristic" taste of the final Welch's product.

Defendant admits that citric acid is added to provide a tart taste.  Citric acid has its own characteristic tart citrus taste that is imparted into food.

Additionally, while Defendant rely on 21 C.F.R. § 170.3(o) for their confused and conflated definitions, Defendant overlook the first two sentences of this regulation:

> The following terms describe the physical or technical functional effects for which direct human food ingredients may be added to foods. They are adopted from the National Academy of Sciences/National Research Council national survey of food industries, reported to the Food and Drug Administration under the contract title "A Comprehensive Survey of Industry on the Use of Food Chemicals Generally

---

[39]   As an example, "[t]he most widely used flavor enhancer is monosodium glutamate." 56 Fed. Reg. at 28598.  Unlike citric acid, monosodium glutamate does not add any distinct taste to foods, but enhances existing tastes.

Recognized as Safe" (September 1972), *which is incorporated by reference*. *See* 21 C.F.R. § 170.3(o) (emphasis added).  The contents of this report (the "GRAS Report") are part of the regulation. Indeed, FDA amended 21 C.F.R. § 170.3(o) for the express purpose of making clear that this report is incorporated into the regulation.  *See* 47 Fed. Reg. 11835-01 (Mar. 19, 1982). The GRAS Report (and, through incorporation, the regulation) expressly states that citric acid is used as a flavoring agent.

**VII.    Consumer Surveys Are Not Required**

Welch's contends that Plaintiff is required to submit a consumer survey to support his claims.  This is not the law in California.

1.    "Surveys and expert testimony regarding consumer assumptions and expectations may be offered *but are not required*."  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) (emphasis added) (citing *Brockey v. Moore*, 107 Cal. App. 4th 86, 99, 131 Cal. Rptr. 2d 746, 756 (2003) ("He fails to cite a single California case requiring use of survey evidence in unfair business practices cases, only lower federal court cases which are neither binding nor persuasive, to the extent they hold that direct evidence that many people were misled can never show that a reasonable consumer would likely be misled…. We are not persuaded that these cases accurately reflect California law.").  *See also*, *Park v. Cytodyne Technologies, Inc.*, 2003 WL 21283814, *5 (Cal. Superior May 30, 2003) ("to establish that advertising is misleading under a reasonable consumer test should not *require* the use of consumer surveys."); *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 672, 38 Cal. Rptr. 3d 36, 40 (2006) ("The evidence presented was sufficient, without further extrinsic evidence—such as a consumer survey—to establish that Leatherman's representations were deceptive."); *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, 642 F. Supp. 2d 957, 968 (N.D. 2008) (rejected the argument that a plaintiff is required to present extrinsic evidence such as consumer surveys to show that consumers had been misled); *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1362, 8 Cal. Rptr. 3d 22 (2003) (finding that proof of a false advertising claim may be provided by "testing, scientific literature, or anecdotal evidence.").

**VIII.    There Is A Genuine Dispute Of Material Fact Whether An "All Natural " Claim Is Material To Consumers**

**1.    Legal Standards Regarding "Materiality"**

A representation is "material" if a reasonable consumer would attach importance to the representation *or* if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013).  Note, there is no requirement that the representation be *the most* important reason.  *See Ries v. Ariz. Bevs. United States Llc, Hornell Brewing Co.*, 287 F.R.D. 523, 531 (N.D. Cal. 2012) ("The fact that plaintiffs had multiple reasons for purchasing the drinks, just as any ordinary consumer likely would, does not entitle Defendant to summary judgment.").  Moreover, the legislature's decision to prohibit a particular misleading advertising practice is evidence that the legislature has deemed that the practice constitutes a 'material' misrepresentation, and courts must defer to that determination." *Hinojos,* 718 F.3d at 1107. The 9th Circuit recognized that "the materiality of a misrepresentation is typically an issue of fact…." *Id. (citing In re Steroid Hormone Product Cases,* 181 Cal.App.4th 145, 104 Cal.Rptr.3d 329, 338–39 (2010)).  Materiality is a question of fact for the jury unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009).  At least one court in this District has already found "the representation that a beverage is 'All Natural' or '100% Natural' is likely to be material."  *Ries*, 287 F.R.D. at 531.

**IX.    PLAINTIFF HAS ESTABLISHED ALL ELEMENTS OF MISLEADING ACTIONS AND FRAUD**

Defendant argues that Plaintiffs UCL, FAL and CLRA claims must be barred because Plaintiffs provide no evidence that they relied upon misleading statements to their detriment. This is simply wrong.  As shown above, Plaintiffs relied upon the NSA claim to mean that the 100% Juices they purchased were healthy, low calorie alternatives when the juices were in fact high calorie, and this response is exactly what the FDA meant when it said that consumers would "likely be deceived" by NSA claims.  Plaintiffs have also clearly established *supra* that there is a

question of fact as to whether Defendant's All Natural claims in conjunction with the "no

artificial preservatives" and "no artificial flavors" were false and/or misleading.

As an initial matter, CLRA claims cannot be disposed of by motion for summary

judgment. (Civ. Code, § 1781, subd. (c)(3).) The Court should have to read no further to deny

Defendant's motion.   However, even assuming the Court could rule on a summary judgment

motion, Defendant's arguments fail.   The CLRA "shall be liberally construed." (Civ. Code, §

1760.)   "The CLRA proscribes particular 'unfair methods of competition and unfair or deceptive

acts or practices' in transactions for the sale or lease of goods or services to consumers. (Civ.

Code, § 1770, subd. (a) … .)" (Collins v. eMachines, Inc. (2011) 202 Cal.App.4th 249, 255 [134

Cal.Rptr.3d 588] (Collins).) *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1172

(2015). (3) For a claim of fraudulent omission to be actionable under the CLRA, "the omission

must be contrary to a representation actually made by the defendant, or an omission of a fact the

defendant was obliged to disclose." (*Daugherty v. American Honda Motor Co.* (2006) 144

Cal.App.4th 824, 835 [51 Cal. Rptr. 3d 118] (*Daugherty*).) *Id.*   Defendant does not and cannot

assert that they had no duty to supply the disclosure statement required by 21 CFR § 101.60(c).

Thus, Plaintiffs claims are actionable as an omission of a fact Welch's was required to disclose

but didn't and on which Plaintiffs relied to their detriment.

With respect to the UCL claims made by Plaintiffs:

> The purpose of the unfair competition law (UCL), Bus. & Prof. Code, § 17200 et seq., is
> to protect both consumers and competitors by promoting fair competition in commercial
> markets for goods and services. It defines "unfair competition" to mean and include any
> unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or
> misleading advertising and any act prohibited by the false advertising law, Bus. & Prof.
> Code, § 17500 et seq. The scope of the UCL is quite broad. Because § 17200 is framed in
> the disjunctive, a business practice need only meet one of the three criteria (unlawful,
> unfair or fraudulent) to be considered unfair competition."

*Rutledge*, at 1167.  "[A] claim for fraudulent business practices 'reflects the UCL's focus on the

defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose

of protecting the general public against unscrupulous business practices.'" *Id,* quoting *In re*

*Tobacco II Cases*, 46 Cal.4th 298, 312, 93 Cal. Rptr. 3d 559, 207 P.3d 20 (2009).   At a bare

minimum, if the Court focuses on Defendant's act of not having a required disclosure to alert the

consumer reading an NSA claim that the 100% Juices have more sugar ounce per ounce than a Coke, it can see why the FDA was so concerned that NSA claims would mislead customers and how Welch's NSA claim did mislead Plaintiffs as well as being unlawful per se by not including the disclosure.

## X.   DEFENDANT'S PRODUCTS ARE UNLAWFULLY MISBRANDED

Defendant implies that it should be able to avoid the requirements of California food labeling laws because "no consumer has ever been arrested for allegedly mislabeled goods." [Def. Mot. at 16.]   Since the UCL focuses on the acts of the manufacturer as opposed to the purchaser, see *supra*, this argument is akin to saying that if a corporation were driving a car, it could go over the speed limit on a particular road because no one had ever been given cited for speeding on that road.  Indeed, this Court has already recognized that the mere possibility of prosecution under the law is what is important when the Court found:

> The fact remains, however, that in California, "[i]t is unlawful for any person to . . . hold or offer for sale any food that is misbranded," and the statute establishing that is subject to the punishments described above. 21 That means that Plaintiffs could, in fact, be arrested and prosecuted for unlawful possession of misbranded goods. However unlikely, it is plausible in the *Twombly* and *Iqbal* sense of the word to believe that Plaintiffs may have acted differently if they were aware of a way to avoid it, thus making the liability relevant to this case. This is true even if the contraband at issue is not illegal drugs, 22 but the label on a bottle of delicious grape juice.

*Park v. Welch Foods, Inc.,* 2014 U.S. Dist. LEXIS 37796 (N.D. Cal. 2014).  Defendants have provided no evidence that with respect to Defendant's products that Plaintiffs would not have avoided illegal acts if they had known, and as such, the decision as to what Plaintiffs might have done differently is a question of fact.  Moreover, the acts of the Defendants in this very litigation show that there is at least a serious potential for prosecution.

> 14 Q. Do you now believe that you were violating
> 15 the law for the period 2008 through 2012, when you
> 16 were holding Welch's products in your possession?
> 17 MR. GORE: Objection. Calls for a legal
> 18 conclusion. You may answer.
> 19 MR. SIEGLER: And I want to caution the
> 20 witness -- and, Counsel, you may want to do this.
> 21 MR. BARRETT: We may want to take a quick
> 22 break.
> 23 MR. SIEGLER: I'd caution the witness she

24 has a Fifth Amendment right. So I'm going to ask
25 that you advise your witness about her Firth
Amendment right.
2 MR. GORE: I'd like the transcript to
3 reflect I think you're joking. Are you joking?
4 MR. SIEGLER: Counsel, you have made an
5 allegation in this complaint of criminal conduct.
6 MR. GORE: Are you joking about our
7 advising our client about her Fifth Amendment right?
8 MR. SIEGLER: No, sir.

(Park Deposition at 101:14-102:8).  Mrs. Park was further questioned on illegality under the statute, and her response shows that she was fully aware that she had if fact had broken the law when she purchased misbranded foods.

24 Q. Do you believe you were violating the
25 criminal law between 2008 and 2012, by selling or
I holding any Welch's products?
2 A. Well, I now know that between the periods
3 2008 and '12, that Welch's sold, and I purchased, a
4 misbranded product.

(Id. at 105:24-106:4)  Clearly, Welch Foods cannot argue with a straight face that the fear of prosecution is impossible when they are using it as a heavy handed tool against the Plaintiffs during depositions.

### XI.  DEFENDANT HAS FAILED TO MEET ITS BURDEN TO SHOW PLAINTIFFS' CLAIM FOR IMPLIED BREACH OF WARRANTY FAILS

Defendant argues that "since Plaintiffs are not merchants, did not resell the products, did not give pre-suit notice, fully consumed the products, and did not suffer any injury, the products were and are merchantable."  [Def. Mot. at 23]  But, each of these arguments fails.

**Privity**:  Usually, vertical privity of contract is required between a plaintiff and defendant for an implied warranty of merchantability suit to be brought. However, exceptions have been made when it comes to drugs, pesticides, and foodstuffs; things where the consumer must rely on advertisements and packaging from the manufacturer. "In adopting the statute here concerned as a part of the Uniform Sales Act, it was the clear intent of the legislature that, with respect to foodstuffs, the implied warranty provision therein contained should inure to the benefit of any ultimate purchaser or consumer of food; and that it was not intended that a strict 'privity of contract' would be essential for the bringing of an action by such ultimate consumer for an asserted breach of the implied warranty." *Klein v. Duchess Sandwich Co.*, 14 Cal. 2d 272, 283,

1    93 P.2d 799, 804 (1939).

2        **Notice**:  Defendants state that since they did not receive an official separate notice letter

3    alerting them to a breach of warranty, Plaintiffs' claim must fail.  However, providing such a

4    stringent requirement when Plaintiffs had alerted them almost eleven months earlier that the

5    subject labels violated California law would undermine the notice requirement.  Plaintiffs filed

6    their original action informing Welch Foods that its products were unlawful and misleading on

7    December 20, 2012 [Dkt. #1]. It was not until October 30, 2013 that Plaintiffs added the separate

8    claim.  "This notice requirement is designed to allow the seller the opportunity to repair the

9    defective item, reduce damages, avoid defective products in the future, and negotiate settlements.

10   The notice also informs the seller of the need to preserve evidence and to be prepared to defend

11   against the suit, and protects against stale claims." *Cardinal Health 301, Inc. v. Tyco Electronics*

12   *Corp.,* 169 Cal. App. 4th 116, 135, 87 Cal. Rptr. 3d 5, 21 (2008). Defendant had ten months to

13   meet what the notice requirement contemplates, offer settlement, etcetera.  They did not.    "The

14   question of whether notice was reasonable must be determined from the particular circumstances

15   and, where but one inference can be drawn from undisputed facts, the issue may be determined as

16   a matter of law." *Fieldstone Co. v. Briggs Plumbing Products, Inc*., 54 Cal. App. 4th 357, 370, 62

17   Cal. Rptr. 2d 701, 709 (1997).

18       **Positions not raised by Defendants**:  As this Court has noted, "although Welch [] may

19   take issue with the California Commercial Code, it states clearly that 'a warranty that the goods

20   shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect

21   to goods of that kind,' and that in order to be merchantable, a product must '[c]onform to the

22   promises or affirmations of fact made on the container or label.'" *Park v. Welch Foods, Inc.*, 2014

23   U.S. Dist. LEXIS 37796, *6-7 (N.D. Cal. 2014).    Defendant has presented no evidence against

24   Plaintiffs' allegation that they would not have purchased Defendant's misbranded 100% Juices

25   and Natural Spreads if they had known that they were unlawful and misleading.  As such,

26   whatever evidence that Defendants may produce in the future will merely go to the likelihood that

27   Plaintiffs would have acted one way or another.  This is a question of fact that cannot be

28   dispensed with on a motion for summary judgment.

California law with respect to implied warranty provides:
(1)  Unless excluded or modified (Section 2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
(2)  Goods to be merchantable must be at least such as (a) Pass without objection in the trade under the contract description; and
(b)  In the case of fungible goods, are of fair average quality within the description; and
(c)  Are fit for the ordinary purposes for which such goods are used; and
(d)  Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e)  Are adequately contained, packaged, and labeled as the agreement may require; and
(f)  Conform to the promises or affirmations of fact made on the container or label if any.

Cal U Com Code § 2314.  As this Court has pointed out, "but Section 2314 provides a conjunctive list of requirements for merchantability, not a disjunctive one; <u>if a product fails to meet even one of the requirements set forth in that section, it is not merchantable</u>."  *Park, et al* at *7 (emphasis added).

"Subsection (2) does not purport to exhaust the meaning of "merchantable" nor to negate any of its attributes not specifically mentioned in the text of the statute, but arising by usage of trade or through case law. The language used is "must be at least such as .....," and the intention is to leave open other possible attributes of merchantability."

Cal U Com Code § 2314(note 6).  Defendant's argument ignores whether the products are adequately labeled as the agreement may require. "[T]he general obligation of good faith which requires that a buyer should not be placed in the position of reselling *or using goods delivered under false representations appearing on the package or container*." *Id* at note 10. In the instant case, Plaintiff have alleged and testified that they were misled by the NSA and All Natural claims which were affirmations of fact that the product were low calorie beverages.  Thus, a fact issue exists as to whether 1) the products were adequately labeled and 2) the statements were so misleading to be a breach of the affirmations and promises on the labels.

### Products were not fit for the ordinary purpose which Plaintiffs purchased them

A genuine fact issue exists as to what the ordinary purpose of Defendants improperly labeled products were while Plaintiff was purchasing them. The purpose for buying an all-natural food without artificial preservatives and without artificial colors is to have a product that is 100%

1   natural.  As shown above, Defendant's natural claim is just false, because Plaintiff has provided

2   reliable evidence to the contrary of Defendant's assertion, summary judgment is inappropriate.

3   As to the NSA claim, Plaintiffs fell prey to the NSA claim without disclaimer and held the

4   purpose to "consume a low-calorie food product." (Park Depo. at 113). When asked as to what

5   the label stated purpose was to her, Mrs. Otto stated she thought, " [t]hat I was buying a product

6   that had no sugar.  It was low in calories." (Otto Depo. at 171).   What messages the label

7   statements make about a particular product are issues of fact that should not be dealt with in a

8   summary judgment motion.  "The question of whether a manufacturer's representation about a

9   product is specific, and was relied upon by a consumer, should be decided by a trier of fact."

10  *Rutledge*, 238 Cal. App. 4th 1164, 1167 (2015).

11      **Damages:**  The Court is not and should not be constrained by Defendant's argument

12  against price premium for the two individual plaintiffs for whom Defendants have moved against

13  for summary judgment.   Plaintiffs have alleged-and there is no evidence presented to the

14  contrary-that they each would not have purchased the products at all if they had known about the

15  unlawfulness and/or misleading nature of the labels.  See, TAC, Dkt. 36 at ¶¶ 5, 86, 102, 104-05,

16  192.   Defendant's argument that Plaintiffs have testified that they would purchase the subject

17  products again if they were properly labeled does not preclude by law Plaintiff's claims.  As seen

18  *supra*, if Plaintiff did purchase Defendants products in the future, it would be for a different

19  purpose. As such, a triable issue exist in that jury should be allowed to discern if any percentage

20  of Plaintiffs' purchases were made for supplying a treat to their family as opposed to a low calorie

21  staple in the home.

22      Dated this 31th day of August, 2015.

23

24      Respectfully submitted:

25       /s/  *Richard R. Barrett*
        Richard R. Barrett (*admitted pro hac vice*)
26

27

28

Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road, Suite 1011
Oxford, MS 38655
Telephone: (662) 380-5018
Fax: (866) 430-5459
rrb@rrblawfirm.net

1

2

**CERTIFICATE OF SERVICE**

3

I hereby certify that a true and complete copy of the forgoing with all attachments was

4

served via the Court's ECF system on all counsel of record on August 31, 2015.

5

*/s/  Richard R. Barrett*

Richard R. Barrett

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28